Jimmie R. RADFORD, Appellant,

v.

Hon. Eddie C. LOVELACE, Judge
Cumberland Circuit Court,
Appellee,

and

Commonwealth of Kentucky,
Real Party in Interest.

No. 2005–SC–1024–MR.

Supreme Court of Kentucky.

June 15, 2006.

As Modified Aug. 10, 2006.

Rehearing Denied Feb. 22, 2007.

David A. Lambertus, Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Matthew R. Krygiel, Assistant Attorney General, Office of Criminal Appeals, Frankfort, Charlton Clay Hudley, Jr., Tompkinsville, Jesse M. Stockton, Jr., Albany, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

The Appellant, Jimmie R. Radford, appeals as a matter of right, CR 76.36(7)(a), from an order of the Court of Appeals denying his petition for writ of prohibition to prevent his retrial on charges of one (1) count of forgery in the second degree in violation of KRS 516.030 and three (3) counts of theft by failure to make required

disposition of property over three hundred dollars in violation of KRS 514.070. The Appellant argues that the trial court erroneously declared a mistrial without the "manifest necessity" necessary to do so, subjecting him to retrial after jeopardy had already attached, thus violating his constitutional right not be tried twice for the same offense under the Fifth Amendment of the Constitution of the United States and Section Thirteen of the Kentucky Constitution.

Based upon the evidence of record, we agree and grant the writ barring the retrial.

## I. Facts and procedural background

The Appellant was indicted in the Cumberland Circuit Court on December 19, 2002.[1] The jury trial began on July 26, 2004. On the second day, after the jury had been empanelled and the Commonwealth had called several witnesses, the Commonwealth approached the bench and notified the court that the Appellant's sister-in-law, Sherry Radford (Radford), had spoken with three of their forthcoming witnesses sometime before the trial date. The witnesses were Ms. Burchett, Ms. Morrison, and Ms. Rush. All were witnesses whose initials were contained on certain documents the Commonwealth alleged were forged. Apparently, they had told the Commonwealth about the calls. The trial court then took sworn testimony from the witnesses in chambers.

Burchett had worked for the Cumberland County Middle School for approximately four years as an instruction assistant and was one of the teachers that took up tickets during events. Radford also worked for the school. Burchett told the court that before she was interviewed by law enforcement officers, and before she even knew she would be a witness, or subpoenaed to testify by the Commonwealth, Radford had called her on the phone. During the conversation, Radford told her that the Appellant asked her to call and tell her that the "other side" would be contacting her. Radford also told her that all she needed to do, if they called, was answer yes or no to the questions they asked—she did not have to elaborate.[2] *She testified that Radford did not ask her to lie to the Commonwealth, nor was she threatened or intimidated by Radford.* She also testified that Radford did not ask her not to come to court or anything of that nature.

Morrison had worked at Cumberland County Middle School as a seventh grade language arts teacher for fourteen years. She had known Radford for a number of years. Morrison received a call from Radford about two weeks prior to trial. She stated that Radford called her on behalf of the Appellant to tell her that if the Commonwealth's Attorney's office called, she did not have to answer more than a simple yes or no to any questions asked of her. Radford also told her that anything that she said could be used against the Appel-

---

1. It can be inferred from the record that the Appellant worked for the Cumberland County School System, and the charges were somehow connected with tickets sales for school events.

2. Burchett was asked, "Is that all she asked you to do is just answer yes or no and not to elaborate," and Burchett answered "Yes, sir." Then she was asked "Did she tell you that anything you said could hurt Mr. Radford," to

which she answered, "No." Q: And you were not told to lie or anything like that, or asked to lie about anything? A: Oh no sir. Thus, there is no suggestion from the record that the comment on answering "yes or no" to the questions that might be asked was intended to prompt a "yes or no" answer to any question to which such answer would be inappropriate, or to give a false answer to any questions asked.

lant in court. However, she was not asked to be absent from court or anything of that nature. Morrison told the court that the conversation was friendly, there were no threatening or intimidating comments, and *Radford did not ask her to make up anything or to lie for the Appellant.*[3] She said that she has had no contact with Radford since that phone conversation.

The last witness, Rush, was a cook at the Cumberland County High School. At the time of trial, she had worked for the school for eight years and had also participated in taking up tickets at events held at the school. Rush and Radford were friends and had worked together for seven years. She stated that about two weeks before trial, and before she was subpoenaed, Radford called her, per the request of the Appellant, to tell her she was going to be subpoenaed and, since Rush worked two jobs, she might need to ask off work to be available for trial. Radford also told her if she did not want to talk to the "other side" over the phone, she did not have to. *Rush said the conversation was friendly, and that she was not asked to lie or to try to get out of testifying for the*

*Commonwealth.* She stated that there were no threats or encouragements to lie or not show up for court, just that she would be contacted and that she did not have to talk to them over the phone.[4]

The judge spoke to Radford last. Without being sworn in, but after being read her Miranda rights, Radford answered questions from the court. First, she denied she had contacted any of the witnesses. Then, she admitted to calling Morrison and Rush and telling them that they may be summoned to court, but denied talking about any specific questions or answers involving the case.[5]

According to the record, following the hearing, the judge took the bench and declared a mistrial on his own motion. Moreover, the briefs disclose that Radford has never been charged with any crime of obstruction of justice relating to her conduct in this case.

As to the declaration of a mistrial, the record does not disclose that the trial court mentioned in chambers that it was going to declare a mistrial. According to the record, the first mention by the trial court

3. Morrison was asked "And, she [Radford] didn't tell you to lie about anything or make up anything or anything like that," and Morrison replied, "Right." Then the question, "Didn't tell you not to come to court and tell the truth," and Morrison replied "No, nothing was mentioned about court."

4. Rush was asked, "Did she suggest that you—— how that you should answer the questions that we ask you?" to which she answered, "No. no." Q: Did she ask you to just limit your answers to yes or no and don't give any explanation? A: She said if I didn't want to talk to them, I would tell them I didn't want to talk to them. When Rush was asked about the substance of her conversation with Radford, she replied, "Well, she called and she told me that—that she had talked to Jimmie, and Jimmie had asked her to call me and tell me that I might be questioned—I mean might be called by either of the lawyer—or, one of the lawyers or both. And, if I didn't

want to talk to them, I wouldn't have to over the phone." Q: And, she didn't tell you to lie or ... A: No. Q: Make up anything ... A: No. Q: Or leave out anything—didn't tell you not to come to Court? A: No.

5. The court told Radford that "certain witnesses have testified ... that you called them at the behest of your brother [sic]," to which Radford replied, "I haven't called anybody." However, when the court asked, "you have specifically not called Angela Burchett and talked to her about the case," Radford replied, "I just called and told her we was going to be summoned." The court next asked, "You have not talked to Angela Morrison, Becky Rush," to which Radford replied, "We just talked about we was [sic] being summoned. We all talked about that. We've not talked about the case." After this, the court stopped questioning Radford because of the possible ramifications due to her lack of representation at the time.

of a mistrial was from the bench when the trial court dismissed the jury. Therefore, there is no argument that the Appellant consented to the mistrial because the record does not provide any evidence that a mistrial was even discussed, or moved for by the Commonwealth, before the trial court dismissed the jury. Were it otherwise, one would expect such to be disclosed to the court in the briefs, or by supplementation of the record; it was not. Therefore, the Appellant's first chance to make an objection on the record was when the trial court had already disclosed the substance of the testimony heard in chambers, and concluded that "based upon this allegation that we heard in chambers, I am going to declare a mistrial." By this time, the prejudicial effects on the Appellant outweighed any need to make an objection to the point that the trial should continue.

Furthermore, RCr 9.22 states that if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice that party. This rule is almost identical to Federal Rule of Criminal Procedure 51(b), which provides, in part, that if a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party. Therefore, when "the very first time there was mention of [a mistrial was] when the court [declared a mistrial,] [i]t was clear ... that the time for argument was over [and the Appellant] simply could not [have] waive[d][his] opportunity to object when [he] was never given such an opportunity." *United States v. Breeding,* 109 F.3d 308, 310 (6th Cir.1997)(citing *United States v. Hickey,* 917 F.2d 901, 906 (6th Cir.1990)). In regards to an appropriate opportunity, one would not seriously argue for the right to have his client tried in front of the same jury that had listened to the trial court's comments on this matter.

On November 7, 2005, the Appellant filed a petition for writ of prohibition with the Court of Appeals, alleging the trial court lacked the "manifest necessity" necessary to declare a mistrial, and thus, his retrial would violate his constitutional rights of double jeopardy. On November 28, 2005, the Court of Appeals denied the writ.

In its opinion, the Court of Appeals held that the Appellant did not demonstrate that the trial court abused its discretion in granting a mistrial. Furthermore, without citations, it held that Radford's contact and conversations with the witnesses were inappropriate, thus validating the mistrial.

## II. Writ of Prohibition

■ "A writ of prohibition is an 'extraordinary remedy and we have always been cautious and conservative both in entertaining petitions for and in granting such relief.'" *Grange Mutual Insurance Co. v. Trude,* 151 S.W.3d 803, 808 (Ky.2004)(citing *Bender v. Eaton,* 343 S.W.2d 799 (Ky.1961)). Writs are generally divided into two classes and are distinguished by "'whether the inferior court allegedly is (1) acting without jurisdiction (which includes "beyond its jurisdiction"), or (2) acting erroneously within its jurisdiction.'" *Id.* The second class applies to the case at hand because it is argued the trial court is about to act erroneously in allowing a retrial of the appellant.

■ "In the second class of cases relief ordinarily has not been granted unless the petitioner established, as conditions precedent, that he (a) had no adequate remedy by appeal or otherwise, *and* (b) would suffer great and irreparable injury." *Bender v. Eaton,* 343 S.W.2d 799, 801 (Ky. 1961). "As a general rule, if he has an adequate remedy by appeal or otherwise, or will not suffer great and irreparable injury, the petition should be dismissed

forthwith." *Id.* There is a third hybrid class, which is not pertinent here. *See Independent Order of Foresters v. Chauvin,* 175 S.W.3d 610, 615–6 (Ky.2005).

■ The Supreme Court is given very broad supervisory control of lower courts by Section 110 of the Kentucky Constitution. However, its authority is limited by our judicial discretion, and we must evaluate each case based upon its own merits. *Bender,* 343 S.W.2d at 800 (citing *Renshaw v. Cook,* 129 Ky. 347, 111 S.W. 377 (Ky. 1908); *Rush v. Denhardt,* 138 Ky. 238, 127 S.W. 785 (Ky.1910); *Ohio River Contract Co. v. Gordon,* 170 Ky. 412, 186 S.W. 178 (Ky.1916); *Harrod v. Meigs,* 340 S.W.2d 601 (Ky.1960)).

## A. Review of writs

■ We must review this matter under an appellate standard because it has come before us as a matter of right appeal and not an original action. *Grange,* 151 S.W.3d at 809. "[T]he proper standard" of review "actually depends on the class, or category, of writ case." *Id.* at 810.

■ "[Writs] are truly extraordinary in nature and are reserved exclusively for those situations where litigants will be subjected to substantial injustice if they are required to proceed." *Foresters,* 175 S.W.3d at 615–6 (Ky.2005); *Grange,* 151 S.W.3d at 810. The bar is set high, requiring "conditions precedent," before an "appellate court can even reach the question of whether the lower court has committed error." *Id.* Where "the lower court is acting within its jurisdiction, but in error, the court with which the petition for a writ is filed only reaches the decision as to issuance of the writ once it finds the existence of the 'conditions precedent,' i.e., no adequate remedy on appeal, and great and irreparable harm." *Grange,* 151 S.W.3d at 810. " 'If [these] procedural prerequisites for a writ are satisfied, whether to grant or deny a petition for a writ is within the

court's discretion.' " *Id.* (citations omitted).

## B. Pre-requisite A: No adequate remedy by appeal or otherwise

■ Cases involving the second class of writs have required the petitioner to pass the first test, showing he/she has no adequate remedy by appeal or otherwise. *Bender,* 343 S.W.2d at 801. "Lack of an adequate remedy by appeal is an absolute prerequisite to the issuance of a writ under this second category." *Foresters,* 175 S.W.3d at 615 (citing *Bender,* 343 S.W.2d at 801). Notably, "the right to appeal does not necessarily indicate an adequate remedy." *Chamblee v. Rose,* 249 S.W.2d 775, 777 (Ky.1952). "In determining the adequacy of another remedy it may be necessary to examine the injurious consequences." *Bender,* 343 S.W.2d at 801.

■ Here, we have a unique scenario where a mistrial was declared, and the denial of a writ, if not well grounded, could violate the Appellant's Constitutional right against double jeopardy. "Since a mistrial, by definition, does not dispose of the merits of a case or necessarily preclude future litigation, the appellant did not have an adequate remedy by appeal from the mistrial order." *Macklin v. Ryan,* 672 S.W.2d 60, 61 (Ky.1984). Therefore, if the mistrial was in error, the appellant here has no adequate remedy, by appeal or otherwise, and would successfully meet the first test.

## C. Pre-requisite B: Great and irreparable injury (great injustice)

■ With respect to test B, it is necessary that great and irreparable injury will be suffered by the petitioner. *Bender,* 343 S.W.2d at 802. The injury should be of a ruinous or grievous nature, or resulting in

a substantial miscarriage of justice. *Id.* The analysis of the second part of the test for relief by prohibition, a showing of "great injustice," must therefore, also focus upon the merits of the double jeopardy issue. *Macklin,* 672 S.W.2d at 61.

### III. Double jeopardy

■ Section Thirteen of the Kentucky Constitution provides that "[n]o person shall, for the same offense, be twice put in jeopardy of his life or limb." It is identical to the double jeopardy clause of the Fifth Amendment of the United States Constitution. "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, or contemporaneously-impaneled alternates, is barred unless 1) there is a 'manifest necessity' for a mistrial or 2) the defendant either requests or consents to a mistrial." *Commonwealth v. Ray,* 982 S.W.2d 671, 673 (Ky.App.1998) (citing KRS 505.030(4); *Leibson v. Taylor,* 721 S.W.2d 690, 693 (Ky.1986); *United States v. Dinitz,* 424 U.S. 600, 606–07, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976)).

> The Fifth Amendment of the Constitution of the United States and Section 13 of the Constitution of Kentucky guarantee that no person shall be tried twice for the same offense. However, the principle of double jeopardy does not prevent re-trial if the proceedings are terminated because "[t]he trial court, in exercise of its discretion finds that the termination is manifestly necessary." As stated, a finding of manifest necessity is a matter left to the sound discretion of the trial court. *Thus, a trial court's grant of a mistrial will be over-*

turned only if it is clearly erroneous or constitutes an abuse of discretion.

*Commonwealth v. Scott,* 12 S.W.3d 682, 684 (Ky.2000)(footnotes omitted)(emphasis added). For purposes of double jeopardy here, the point at which jeopardy attaches is the swearing of the first witness. KRS 505.030(4).

### 1. Manifest necessity

■ "Although a trial court is vested with discretion in granting a mistrial, the power to grant a mistrial ought to be used sparingly and only with the utmost caution, under urgent circumstances, and for very plain and obvious causes." *Scott,* 12 S.W.3d at 685 (citing *Glover v. McMackin,* 950 F.2d 1236, 1240 (6th Cir.1991)(quoting *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824))). Thus, the trial judge, in making a mistrial decision, must use "sound discretion" in declaring a mistrial because a constitutionally protected interest is inevitably affected. *Grimes v. McAnulty,* 957 S.W.2d 223, 225 (Ky.1997).[6]

■ "Manifest necessity has been described as an 'urgent or real necessity.' " *Scott,* 12 S.W.3d at 684 (citing *Miller v. Commonwealth,* 925 S.W.2d 449, 453 (Ky. 1996)). Thus, "[t]he propriety of granting a mistrial is determined on a case by case basis." *Id.* "In some cases the declaration of a mistrial by a presiding judge when there was no manifest necessity to do so will prevent retrial." *Nichols v. Commonwealth,* 657 S.W.2d 932, 933 (Ky.1983)(citing *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)). The dissent

---

**6.** Although the dissent appropriately discusses the time restraints of a trial judge along with judicial economy, we must to keep in mind that this case is not questioning a decision to admit evidence. The issue here is one of constitutional implications. And, as stated above, the decision to declare a mistrial "ought to be used sparingly and only with the utmost caution" because of those implications. See Glover and Grimes, supra.

asserts that "[t]he question before us is not whether there is manifest injustice, but whether the trial court abused its discretion in declaring a mistrial." Yet, when determining whether a trial court's decision to declare a mistrial was "unsupported by sound legal principles," i.e., an abuse of its discretion, *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky.2004), it is necessary to examine whether there was manifest necessity to do so, since a mistrial—where no manifest necessity exists—triggers a person's constitutional protection against double jeopardy. And this was the question presented.

### 2. Examples of manifest necessity

■ "The most common example of 'manifest necessity' to grant a mistrial is when a jury is deadlocked and unable to reach a verdict." *Grimes*, 957 S.W.2d at 224. *See Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky.1985), *cert. denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986); *Nichols, supra; Commonwealth v. Crooks*, 655 S.W.2d 475 (Ky.1983). Manifest necessity has also been found when either party introduces improper evidence, or acts in a manner, which prejudices the other's right to a fair trial. *Cf. Grimes*, 957 S.W.2d 223, 225 (Ky.1997); *Chapman v. Richardson*, 740 S.W.2d 929 (Ky.1987); *Stacy v. Manis*, 709 S.W.2d 433 (Ky.1986). It is a party's right to a fair trial, which both guides and constrains us in its use.

### 3. Right to a fair trial

■ When deciding whether there is manifest necessity to declare a mistrial, we must look to see if either parties' right to a fair trial has been infringed upon. *Cf. Wheeler v. Commonwealth*, 121 S.W.3d 173 (Ky.2003). And, the court must always assess if the parties' "interest in seeing the first trial through to a verdict [is] outweighed by 'competing and equally legitimate demand for [protection of the parties' rights and] public justice.'" *Common-*

*wealth v. Scott*, 12 S.W.3d 682, 685 (Ky. 2000) (citations omitted). And most critically, the decision should be based on whether the complained of "event . . . prevented the [party] from receiving a fundamentally fair trial." *Id.* at 685.

Here, we are faced with incidents that occurred prior to the witnesses being interviewed, or subpoenaed, by the Commonwealth, all of which were brought to the court's attention during the trial and after jeopardy had attached to the Appellant.

In regard to witnesses, Kentucky has several statutes that relate to interference with the administration of justice. KRS Chapter 524 provides the elements for activities that would interfere with judicial administration. KRS 524.020, bribing a witness, states that there must be a benefit conferred upon the witness to influence his/her testimony. There is no evidence from the witnesses that they were offered any benefit from Radford, or the Appellant, to testify in a certain manner. KRS 524.040, intimidating a witness, states that there must be use of physical force or threat directed at the witness. The witnesses specifically testified that they were not threatened or intimidated by Radford. KRS 524.045, harassing a witness, states that the person must engage in conduct that hinders the witness from testifying. Again, the witnesses testified that Radford did not ask them to lie or not show up for court. In fact, the witnesses showed up for court and were ready to testify. KRS 524.055, retaliating against a witness, states that a person must engage, or threaten to engage, in bodily injury to the witness or cause, or threaten to cause, damage to tangible property of the witness. There is no evidence or testimony from the witnesses that this occurred.

In fact, we have never answered the question of whether it is an interference

with the administration of justice for one party to contact potential witnesses before trial and tell them they have a right to answer yes or no to questions asked on the telephone, without elaborating, or that if they chose to do so, they do not have to talk on the telephone to the "other side," (at least until they are compelled to do so), where no evidence is offered of intimidation, bribery, or threats to the witnesses.

Other jurisdictions have, however, addressed the question and have held that unless the contact with the witness was an attempt to *influence* the witness not to cooperate, or to lie, or fabricate their testimonies, it is not an obstruction of justice and, therefore, it is not a valid reason for a new trial—or as here—a mistrial. *E.g. United States v. Robinson*, 390 F.3d 853 (6th Cir.2004); *United States v. Black*, 767 F.2d 1334, 1337 (9th Cir.1985); *Kines v. Butterworth*, 669 F.2d 6 (1st Cir.1981); *United States v. Rich*, 580 F.2d 929 (9th Cir.1978); *People v. Fuller*, 117 Ill.App.3d 1026, 73 Ill.Dec. 474, 454 N.E.2d 334, 340 (1983); *State v. Mussehl*, 408 N.W.2d 844 (Minn.1987); *State v. Wilson*, 311 N.C. 117, 316 S.E.2d 46, 52 (1984).

In *Mussehl*, the prosecutor sent letters to twelve witnesses stating that it was entirely up to the witness whether or not they wanted to talk to the defense. The letter told the witnesses that they could tell the defense they did not want to talk to them.[7] Specifically, the prosecutor stated, "[although] I cannot ethically advise you not to cooperate with [the other side] ... [a] defense attorney in a criminal case is ethically obligated to do everything within his power to defend the person

charged with the crime ... trying to get his client acquitted ... bear [this] in mind when you are making your decision as to whether or not you wish to talk with someone from the defense." *Mussehl*, 408 N.W.2d at 845. The court therein recognized that there is no legal obligation for a witness to submit to an interview as long as the contact with the witness does not discourage them from submitting themselves to an interview by opposing counsel. The court also held that the defendant had failed to show that the prosecution's letters had "prejudicially impeded his investigation of the case." *Id.* at 847.

In *Wilson*, the district attorney contacted the witnesses and told them they did not have to speak with the defense attorney unless they wanted to do so. The court noted that one of the witnesses did confer with the defense counsel, while the other was available to the defense counsel, upon permission from the district attorney, since he was in jail.[8] The court here held there was insufficient evidence to establish an obstruction of access to either witness because there was no evidence that the district attorney instructed the witnesses to be uncooperative with the defense. *Wilson*, 316 S.E.2d at 52.

Finally, in *Fuller*, the prosecution told witnesses that they could answer questions, or refuse to be interviewed, by defense counsel. *Fuller*, 73 Ill.Dec. 474, 454 N.E.2d at 340. The court noted that some of the witnesses agreed to speak with the defense counsel, but that others refused, or insisted upon being interviewed only at the offices of the State's Attorney. In *Fuller*, the court held there was no inter-

---

7. Even though the court held in *Mussehl* that the letters did not impede the defendant's investigation, the court recognized that the witnesses *could have concluded* from the letters that the prosecutor was discouraging them from talking to the defense.

8. The defense counsel went to the jail but a detective told him, on his own volition and without instruction from the district attorney, to get permission from the district attorney. *Wilson*, 316 S.E.2d at 52.

ference with the defense counsel's investigation of the case, and, therefore, no error.

In *State v. Ben,* 310 Or. 309, 798 P.2d 650, 654 (1990), the Oregon Supreme Court held it was a violation of the discovery rules *to instruct witnesses not to speak to the prosecutor, unless defense counsel was present.* The court held that because the activity directly contravened "a policy favorable to access to witnesses and evidence," it was improper. *Id.* Also, in *Gregory v. United States,* 369 F.2d 185, 189 (D.C.Cir.1966), the court held the same behavior frustrated the opportunity for an interview and denied the party a fair trial.[9]

In this case, there is no evidence that the Commonwealth's investigation was compromised by Radford's contact with the three witnesses. Nor is there evidence the witnesses failed to cooperate with the Commonwealth. They were present to testify. One was "on call" by the Commonwealth because she had a young baby. Furthermore, the Commonwealth did not argue that their access to the witnesses, or that their preparation and presentation of the case, was hindered because the witnesses were uncooperative. Moreover, the Appellant, through his sister-in-law, *did not tell the witnesses not to talk to the Commonwealth unless she, the Appellant, or his counsel was present.* Nor is there any evidence that her contact with the witnesses frustrated the Commonwealth's opportunity to interview the witnesses or that it denied the Commonwealth a fair trial. It is noteworthy that the Commonwealth has a large arsenal when it comes to compelling testimony.

### 4. Witness's right

■ It is important for us to remember that "both sides have the right to interview witnesses before trial." *United*

States v. Black, 767 F.2d 1334, 1337 (9th Cir.1985); *see United States v. Cook,* 608 F.2d 1175, 1180 (9th Cir.1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). Yet, many courts have rightfully acknowledged that a witness also has the right to refuse to be interviewed by either the defense or the prosecution, *e.g. United States v. Black,* 767 F.2d 1334, 1337 (9th Cir.1985); *United States v. Rich,* 580 F.2d 929 (9th Cir.1978); *State v. Singleton,* 853 S.W.2d 490, 492 (Tenn.1993); *Dover v. State,* 250 Ga. 209, 296 S.E.2d 710, 712–3 (1982)). *E.g. Hill v. State,* 366 So.2d 296, 312 (Ala.Cr.App. 1978); *Commonwealth v. Balliro,* 349 Mass. 505, 209 N.E.2d 308 (1965).

Thus, we are presented with the question, did the contact and conduct described here wrongfully interfere in any way with the Commonwealth's right to investigate and prepare its case. A related question is whether the witnesses were given inaccurate information or guidelines relating to their obligations to speak with a party over the telephone. Is it interference with another party's investigatory rights to tell a potential witness that if called on the telephone, he or she can answer the questions asked with yes or no answers, without elaborating, as long as a "yes or no" answer is appropriate to the question? Admittedly, one can abuse, or obstruct, an inquiry with an inappropriate curt response, such as yes or no. But, there is no evidence that this occurred here. Each witness acknowledged she was not "coached to lie or fabricate testimony." Moreover, is it an obstruction of justice to tell witnesses they do not have to answer questions over the telephone, if they choose not to, as long as no attempt is made to control the witness's decision-

---

**9.** In *Gregory,* the prosecutor had told several of the witnesses to not speak to the defense

unless he was present.

making in regard to how the witnesses will decide to respond?[10] After long reflection, we think not.

### 5. Applicability to this case

■ Here, there is simply no evidence in the record that establishes any injury to the Commonwealth's right to prepare, investigate, and present its case. The subpoenaed witnesses were present at trial to testify and answered the questions asked in chambers. There is no evidence that Radford influenced, or tried to influence, them to lie to the Commonwealth, or to the court, during their interviews or when called to testify. In fact, when the conversations took place, the witnesses had not yet been subpoenaed or contacted by the Commonwealth. In contrast, Radford told them that what they said may be used against the Appellant, that they did not have to elaborate, that they could answer the questions with yes or no answers, and that they had the right not to talk to them at all on the phone, *if they so chose.* The conversations were not threatening or intimidating and did not encourage them to lie or answer particular questions in a certain way. The witnesses were friends with Radford and had worked with her for years. More importantly, Radford did not tell the witnesses not to talk to the other side, and did not encourage them to absent themselves from court.

The evidence in this case simply does not support a showing of manifest necessity. The evidence is in line with the case law of other jurisdictions in which the courts have held that unless the contact with the witness wrongfully threatens or prejudices the other side's ability of discovery, preparation, or presentation, there is no violation. Here, the Commonwealth did not establish, or argue to the trial court, that it was denied the right to a fair trial, or that its ability to develop or present its case was infringed upon due to the telephone calls Radford made to the witnesses. The Commonwealth made no motion for a mistrial. To tell a witness he can answer yes or no to questions asked of him over the phone if he chooses (as long as such an answer is appropriate to the question), or that he or she does not have to discuss a matter over the phone, if he or she chooses, is a correct statement of a witness's rights—thus, it should not be wrong to tell a person such. Thus, in conclusion, the trial court erroneously declared a mistrial absent "manifest necessity" to do so, and therefore, jeopardy having attached, the retrial of the defendant would violate his constitutional right to be free of double jeopardy.

> Our present decision should not be interpreted as approving any ... conduct that has the purpose or effect of discouraging witnesses from cooperating with the [Commonwealth or the accused]. Although the circumstances of this case cannot support a charge of denial of access to witnesses, we recognize that abuses can easily result when officials elect to inform potential witnesses of their right not to speak with [others]. An accused and his counsel have rights of access to potential witnesses that are no less than the accessibility to the potential prosecutors and their investigatory agents. It is imperative [however, that all parties and their agents] maintain a posture of strict neutrality when advising witnesses of their duties and rights. Their role as public servants and as protectors of the integrity of the judicial process permits nothing less.

*United States v. Rich,* 580 F.2d 929, 934 (9th Cir.1978).

---

10. The facts here have nothing to do with responses in compulsory situations, such as under oath at trial, discovery depositions, or grand jury investigations.

## CONCLUSION

Therefore, the ruling of the Court of Appeals is reversed and this case is remanded to the Court of Appeals with directions to issue the writ of prohibition consistent with this opinion, barring the retrial of the defendant, Jimmie R. Radford, by the Cumberland Circuit Court, on the on grounds of double jeopardy.

LAMBERT, C.J., COOPER and GRAVES, JJ., concur.

ROACH, J., dissents by separate opinion, with JOHNSTONE and WINTERSHEIMER, JJ., joining that dissent.

Dissenting opinion by Justice ROACH.

I respectfully dissent. Quite simply, the majority opinion has ignored the standard of review applicable to a trial court's decision to declare a mistrial. Although the majority correctly describes the standard of review of such a decision by an appellate court as abuse of discretion, its application of the standard in this case fails to give the proper level of deference to the trial court. This is evidenced by such statements as: "When deciding there is manifest necessity to declare a mistrial, *we* must look to see if either parties' right to a fair trial has been infringed upon." Ante at 80 (emphasis added). The question before this Court is not whether *we* believe there was a manifest necessity to declare a mistrial, but whether the trial court abused *its* discretion in declaring a mistrial.

As this Court has repeatedly noted, "[w]hether to grant a mistrial is within the sound discretion of the trial court, and such a ruling will not be disturbed absent an abuse of that discretion." *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005) (citation and internal quotation marks omitted). The rationale for this grant of discretion is that the trial court is uniquely situated to evaluate the facts of trial as they emerge in the heat of the moment. We have stated:

> The trial court has *broad discretion* in determining when a mistrial is necessary. As explained in *Wiley v. Commonwealth*, Ky.App., 575 S.W.2d 166 (1979), "Where, for reasons deemed compelling by the trial judge, *who is best situated intelligently* to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared...." *Id.* at 169, quoting *Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961).

*Gosser v. Commonwealth*, 31 S.W.3d 897, 906 (Ky.2000) (emphasis added); *see also Kirkland v. Commonwealth*, 53 S.W.3d 71, 76 (Ky.2001) ("For the purpose of appellate review, the *trial judge is always recognized as the person best situated to properly evaluate the circumstances* as to when a mistrial is required." (emphasis added)); *Grimes v. McAnulty*, 957 S.W.2d 223, 225 (Ky.1997) ("In reviewing a decision to grant a mistrial, the trial court must have a measure of discretion. 'The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that at any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred.' *Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978). Furthermore, '[t]he adoption of a stringent standard of appellate review in this area ... would seriously impede the trial judge in the proper performance of his duty, in order to protect the integrity of the trial....' *Id.* (Quoting *United States v. Dinitz*, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976))."). Our rule is clear; not only is the trial court's decision to grant a mistrial entitled to deference, it is entitled to a *great deal* of deference. That deference requires that we

leave untouched the trial court's decision absent a clear abuse of discretion, the test for which we have described as "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

A review of what actually occurred in this matter demonstrates that the trial court did not abuse its discretion. Prior to trial, Sherry Radford, Appellant's sister-in-law, contacted three women, Becky Rush, Angela Burchett, and Angela Morrison, who were set to testify at trial. The majority's description of Ms. Rush's testimony is accurate. She admitted that Ms. Radford had called and told her that she did not have to talk to the Commonwealth's Attorney if she did not want to. In essence, all Ms. Radford did was inform Ms. Rush that she could choose not the talk to the prosecutor prior to trial. Such contact, while perhaps not ideal, is relatively innocuous and technically not improper. Had the mistrial been predicated on the contact with Ms. Rush alone, the question of whether the trial court abused its discretion would be a closer one. But there was additional testimony from two other witnesses about Ms. Radford's contact with them. That testimony is significantly more troubling—or at least should be—than the majority lets on.

In describing Ms. Radford's contact with Ms. Burchett, the majority states, "Radford told [Ms. Burchett] that the Appellant had asked her to call and tell her that the 'other side' would be contacting her. Radford also told her that all she needed to do, if they called, was answer yes or no to the questions they asked—she did not have to elaborate." Ante at 75). The majority also notes that Ms. Radford neither threatened Ms. Burchett nor asked her to lie. While the majority is technically correct that Ms. Radford made no threats and did not ask Ms. Burchett to lie, the transcript of the trial belies their overall character-

ization of the contact as an innocent attempt to inform the witness of her rights when dealing with the prosecutor. The following is from Ms. Burchett's testimony in the judge's chambers:

Q. Now, about—sometime last week, did you receive a call from Sherry Radford?

A. Yes, sir.

Q. And, what did she tell you?

A. She said that Mr. Radford had—had called her and asked—asked her to call me and let me know—she said, "Well, Mr. Radford wants you to know that—that you're going to be getting a call from the other side." And, I didn't ask who the other side was. She just said you would be getting a call from the other side and *to answer yes to—only to answer yes and no and—and not elaborate on anything.* And, I said—I said, "I don't know anything to elaborate on."

(Emphasis added). Ms. Burchett then testified that Sherry Radford asked her about whether she had caller ID so that she could identify when the Commonwealth was calling her. Ms. Burchett also stated that she was not comfortable talking about the subject matter with Sherry Radford.

The majority describes Ms. Radford's contact with Ms. Morrison in much the same way it described her contact with Ms. Burchett, with a focus on Ms. Radford allegedly only informing Ms. Morrison of how she was free to respond to the "other side." Again, the transcript reveals that Ms. Radford was more than merely "informative." The following is from Ms. Morrison's testimony in the trial judge's chambers:

Q. Did she [Sherry Radford] tell you that Mr. Radford had asked her to call?

A. Yes.

Q. And, what was the tenor of her conversation with you; what did she want you to do?

A. *I was encouraged that if the Commonwealth Attorney's Office called me to answer only yes or no to any questions asked of me on the phone.*

Q. *Don't elaborate on anything, is that what you were told?*

A. *Right.*

Q. Did—did Ms. Radford tell you that anything you said might be used against Jimmie in Court?

A. Yes.

Q. And, was it clear to her tone that she was asking you to be sympathetic in your testimony for Mr. Radford?

A. I think so.

The Court: Let me just ask you this question. Did the call upset you?

A. *A little.*

The Court: In what respect?

A. *Well, I felt like it wasn't the right thing to do.*

(Emphasis added).

After the three witnesses were questioned, Sherry Radford was called into the trial court's chambers. Initially, the court explained to Ms. Radford that certain witnesses had testified that she had called them at the behest of her brother-in-law. The court read Ms. Radford her *Miranda* rights and then asked: "Now, do you wish to make some statements voluntarily or do you wish to procure the services of an attorney?" Ms. Radford responded with a blatant lie, stating, "I don't know what to say. I haven't called anybody." The court then asked, "You—well, I—I don't want to go much farther, but you have not called any people who have been witnesses or may be witnesses in the case involving Jimmie Radford?" Ms. Radford responded, "No," once again lying. The court then asked Ms. Radford about the specific wit-

nesses, whereupon she admitted to having had limited contact with them, stating, "We just talked about we was being summoned. We all talked about that. We've not talked about the case." In light of the other witnesses' testimony recounted above, this statement was also deceptive. At this point the trial court explained to Ms. Radford that she might want to secure the services of an attorney, and Appellant's counsel requested a few minutes to talk to Ms. Radford.

The majority opinion gives the impression that after this last exchange the trial court rushed to open court and declared a mistrial without the attorneys present and without them knowing that a mistrial was going to be declared. A review of the record demonstrates that this simply is not true. After questioning Ms. Radford, the trial judge went into the courtroom and informed the jury there was going to be a recess. Subsequent to the recess, court was convened with the attorneys present. A bench conference was held, the transcript of which demonstrates that the attorneys were aware that a mistrial was about to be granted. Before the mistrial was declared, the following exchange is found in the record:

Commonwealth: Judge, because of the media, particularly, I'm afraid that if you detail too many things at this point it might make it very difficult to get a jury the next time.

The Court: Well, it—it may, but I think the jury deserves an explanation.

At that point no mistrial had been declared. The transcript then reveals the following discussion by the court, the Commonwealth's attorney, and Appellant's attorney, Mr. Lambertus:

The Court: I believe the jury is present. Do both attorneys waive the polling of the jury?

Commonwealth: Yes, your honor.

Mr. Lambertus: Yes.[1]

The trial court then made the following statement to the jury:

Ladies and gentlemen of the jury, yesterday you were selected as jurors in the action of the Commonwealth of Kentucky against Jimmie Radford. You were sworn, and you have heard certain testimony. Since the noon recess, or a short time before the noon recess, the following developments have occurred; this Court was informed, and has heard testimony from Angela Burchett, who is a witness in this particular case. Angela Burchett testified in substance that she was contacted by Sherry Radford, a sister-in-law to this defendant, and that Sherry Radford asked her if she had caller I.D., asked her further that if she is contacted by the Commonwealth Attorney office, or any other person at the Commonwealth Attorney's office, that she should just answer any questions yes or no, and not elaborate. She further stated in very specific terms that she was asked to do this by the defendant, Jimmie Radford. Angela Morrison also testified that she received a call from Sherry Radford. Her statement was that Jimmie—obviously referring to the defendant—asked her to call, and she also was asked by Sherry Radford to answer only yes or no, and further was told that anything she said could be used against Mr. Radford. Becky Rush testified that she received a call from Ms. Radford, and that the call occurred a week ago this past Sunday night, and also this witness testified that Sherry Radford informed her that Jimmy— meaning Jimmie Radford—asked her to call, and that she—meaning Sherry Radford—had talked to Jimmie, and he wanted her to call Ms. Rush. I am first of all going to ask that Sherry Radford be fully investigated. There are laws that relate to intimidation of witnesses or contacting witnesses in any criminal case. I want this matter fully investigated by the Kentucky State Police, the sheriff's department, or other appropriate agencies. As long as I am Judge, I will not tolerate things of this nature. It is a great service for people to come in as jurors and serve. It is a great honor for me to serve as your Judge and to serve the other two counties in my district. I will always strive to see that absolute honesty and decorum is maintained in the course of law. It is an ordeal for anyone to come in as a witness and testify under oath facing skilled attorneys and being asked questions. They should do so without hesitation. They should do so without fear that what they say might be twisted or distorted, and they should be able to explain and amplify the questions and answers that—that are propounded. This is improper. I do not condone it. I want it looked into. And, based upon this allegation that we heard in chambers, I am going to declare a mistrial and discharge this jury as I do not want to proceed when there's a cloud—and a very dark and ominous cloud—hanging over these proceedings. It is a dark day in Cumberland County, or in any other county, in the Commonwealth of Kentucky when actions such as this occur. I will schedule the action of Commonwealth against Jimmie Radford for a pre-trial hearing for further proceedings on the 19th of August, 2004, in the Cumberland Circuit Court. I am sorry that you've wasted your time, ladies and gentlemen of the jury. I am also sorry that proceedings cannot be conducted accord-

---

1. Importantly, Appellant's attorney never objected on the record to the court's decision to grant a mistrial. In addition, Appellant's Brief makes no mention that his arguments were preserved by an objection.

ing to fidelity and legal principles of law when conduct such as this occurs. You remember when your next appearance date will be as members of the jury and that will be August 3. So, you can take your pads with you, or turn them into the sheriff. I assure you that what responses you have written will not be revealed. Court is now adjourned.

In light of what actually happened during the trial, we simply cannot say that the trial court clearly acted inappropriately and therefore abused its discretion. After interviewing the relevant individuals, the trial court concluded that Appellant and Ms. Radford had acted improperly. The record clearly contains evidence to support this conclusion. Both Ms. Burchett and Ms. Morrison stated that they were contacted and given instructions on how to act if contacted by the Commonwealth's Attorney, specifically not to elaborate on anything and to answer only yes and no. Telling a witness what she *may do* is very different from telling a witness *to do* something, as the latter is more in line with a command. Additionally, one of these witnesses testified that she was upset by the call, and the other testified that she had been uncomfortable talking with Ms. Radford. Moreover, when questioned by the trial court, Ms. Radford lied repeatedly about whether she had contacted any witnesses on her brother-in-law's behalf. She admitted to limited contact—less than that described by the witnesses themselves—only after being confronted by the trial court with specific details of her behavior.

Although the majority opinion attempts to make this case about whether Sherry Radford's behavior constituted a crime, this is not the appropriate inquiry. First, it places an impossibly high burden on the trial court to justify declaring a mistrial in that the evidence must prove absolutely that a crime was committed. Though a mistrial is an extraordinary remedy, it is not an impossible one. Moreover, the appropriate inquiry, regardless of whether Sherry Radford committed a crime, is whether the trial court abused its discretion when it declared a mistrial, and thus necessarily found that manifest necessity had occurred. The testimony by Ms. Burchett and Ms. Morrison that they had been instructed to answer questions in a certain way by a relative of a criminal defendant pursuant to the defendant's request, especially when coupled with subsequent deceptive testimony from the relative, was more than enough to arouse the trial court's fear that something improper had occurred. Even if Ms. Radford's behavior was neither criminal nor technically improper, her contact with the witnesses was at the very least untoward, unseemly, and, to me, unsettling.[2]

When presented with such evidence, a trial judge is forced to consider the extreme remedy of a mistrial. Admittedly, in deciding to grant the mistrial in this case, the trial court was armed only with the limited and imperfect information it could garner from questioning the witnesses in the immediately-preceding few minutes. But we must recognize that almost all such decisions are made "under the gun." The fast pace of trial rarely allows the trial judge to take a break to

**2.** It should also be noted that cases from other jurisdictions addressed by the majority for the proposition that only an attempt to influence or limit contact with a witness are grounds for a mistrial, ante at 80–82, are of limited relevance to the matter at hand. All of these cases concern an appeal by a convicted defendant who argues that the trial court denied him due process by not granting a mistrial. Not only is there evidence in this case that Ms. Radford, by telling the witnesses how they should answer questions and by making them feel uncomfortable, may have attempted to influence the witnesses or limited the Commonwealth's access to them, but the trial court actually granted the mistrial.

cautiously ponder the question presented. Such reflective adjudication is a luxury enjoyed primarily by appellate judges like myself and my brethren. On the other hand, the trial judge enjoys a more direct connection to evidence presented at trial, whether from the witness stand or in chambers, even when that evidence is limited or imperfect. This connection is grounded in the trial court's ability to observe first-hand and interact with the relevant witnesses and, usually, a familiarity with the locale, the combination of which ultimately leads to a better grasp of the nuances of the facts and a more robust understanding of the situation at trial. Thus, even though the trial court may have limited information on which to proceed, it is almost always in a better position to evaluate the facts than an appellate court. The trial court's relative advantage in this respect provides the generally accepted, and indeed powerful, rationale for allowing the trial court broad discretion as to whether to grant a mistrial. This broad discretion requires that we defer to the trial court, rather than substituting our own assessment of the situation long after the fact.

With this in mind, I think the transcript makes clear that no one can reasonably conclude that the trial court's decision to grant the mistrial "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945. The trial court was presented with evidence of possibly improper witness contact by a relative of a criminal defendant and at the behest of the defendant. Though the trial court's decision based on this evidence was hurried and no doubt difficult, it was not baseless or capricious. Thus, I can only conclude that the decision to grant a mistrial did not amount to an abuse of its discretion. Thus, I respectfully dissent.

JOHNSTONE and WINTERSHEIMER, JJ., join this dissenting opinion.