## Ray v. Commonwealth.

(Decided November 27, 1931.)

W. A. DAUGHERTY for appellant.

J. W. CAMMACK, Attorney General (BASIL P. COOPER, of counsel), for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

On Saturday morning August 30, 1930, Melvin Branham shot and killed his uncle by marriage, Sam Wright, and was himself shot and killed by his first cousin Henry Branham. An indictment was returned charging Melvin Branham, then deceased, and Charley Ray with the murder of Sam Wright, the indictment charges Melvin Branham did the killing and was aided and abetted by Ray, and, when Ray was tried on June 9, 1931, he was found guilty of manslaughter, his punishment fixed at twelve years in the penitentiary, his motion for a new trial was overruled, and he has appealed.

He filed seven grounds in support of his motion for a new trial, and he is urging six of these for reversal here. One of these is that he was entitled to a peremptory instruction to acquit him, and another is that the verdict is flagrantly against the evidence; so we will state that briefly.

To understand this evidence, one must know something of the members of this family and their relation to each other. Dick Branham and Elizabeth Branham, called "the old folks," are husband and wife. They are

the parents of Mahala Wright; Sam. Wright, now deceased, was their son-in-law, and was Mahala's husband. The old folks are the grandparents of Melvin Branham, the man who slew Sam Wright; also are grandparents of Henry Branham, the man who slew Melvin Branham, and of Sarah Jane Ray, the wife of the defendant. Melvin Branham married a sister of the defendant, and the defendant married a sister of Melvin Branham, a first cousin of Henry Branham and a niece of Mahala Wright.

There had been some trouble in this family, and it had been divided into two factions. The old folks had separated and taken sides in these factions. The old lady, the Wrights, and Henry Branham were members of one faction, while old man Branham, Charley Ray, Melvin Branham, and their wives were members of the other. The two factions lived in the same neighborhood.

On the morning of the homicide, Charley Ray's wife went to the home of the Wrights in search of a pup that had strayed off. When she found the pup, she started to whip it, and her aunt Mahala Wright interfered, and the two women had a fight. Old man Branham ran down there, and he and Sam Wright separated the two warring women. In the meantime Mrs. Ray had sent Orville Branham to tell her husband, Charley Ray; they were beating her up. The child delivered the message, and soon Charley Ray started for the battlefield; he was soon followed by Melvin Branham, while Bradley Branham, the wife of Melvin and sister of Charley Ray, brought up the rear.

Of course Ray asked his wife, when he got there, what the trouble was, whereupon Mahala Wright ran into the house, procured a double-barreled shotgun, loaded it, and started out. Her husband, Sam Wright, seized the shotgun, wrenched it out of her hands, and walked out towards the gate with it. At this point the evidence becomes irreconcilable. The commonwealth contends Ray was in a towering rage and was trying to come into the yard, but was kept out by Wright with the shotgun, when Melvin Branham came up, and, according to Mahala Wright and her son, Charley Ray said to Melvin Branham, "Shoot him, God damn him!" According to the old grandmother, Elizabeth Branham, he said, "Shoot him! God damn him! Shoot him." The old grandfather merely says, "He said for him to shoot him." Anyway Melvin Branham shot Wright, killing him instantly, and was himself shot and instantly killed

by Henry Branham, while the shotgun in the hands of Wright was discharged, the shot going wild. According to Ray, he was talking with Wright, trying to learn the nature of the fight between the women, was unarmed, and had put his hands onto the fence to show Wright he was unarmed, when Melvin Branham, who had come up, without the knowledge of Ray, shot and killed Wright before Ray knew he was anywhere about. As soon as Wright fell, Ray said, "Lord have mercy! Sam has shot himself!" and, having opened the gate, rushed into the yard, and was endeavoring to help Wright to his feet, when he was attacked by Dick Branham with an open knife, and forced out of the gate again, and then for the first time Ray learned, so he says, that Melvin Branham was there and had been killed. The commonwealth has one witness who says he saw Charley Ray and Melvin Branham together going to the home of Wright.

This evidence was sufficient to take the case to the jury and to sustain the verdict; hence the court did not err in overruling Ray's motion that the jury be peremptorily instructed to find him not guilty. The mere presence of Ray at the time Melvin Branham killed Sam Wright would not make Ray responsible for the homicide unless he and Melvin Branham had agreed to come down there and they had gone there for the purpose of killing or doing some great bodily harm to Wright or some member of his household. See Watkins v. Com., 227 Ky. 100, 12 S. W. (2d) 329.

But, if at a time when he did not believe he was in danger of death or some great bodily harm at the hands of Sam Wright or when he had no reasonable cause to believe he was so, he advised or requested Melvin Branham to shoot Wright, then he is responsible therefor. Of course the act of Ray in rushing to the aid of Wright when he fell looks like the conduct of an innocent man, but all these facts made his guilt or innocence a question for the jury under the instructions in which we find no fault.

This disposes of all the grounds urged for reversal but two, one of which is directed to the manner in which the jury arrived at their verdict, in which there is no merit. The showing on this score is that some jurors favored six years of punishment, others eighteen, and they compromised on twelve, to which they all agreed.

The other ground for reversal is meritorious, and it is sustained: It is this: Before the attorney for the commonwealth stated the case to the jury, the defendant requested of the court that the witnesses be put under the rule and excluded from the courtroom. See section 601 of Code of Practice in civil cases.

In Boyd v. Com., 194 Ky. 73, 238 S. W. 182, we cited section 151 of the Code of Practice in criminal cases and section 601 of the Civil Code of Practice and intimated that it was within the discretion of the trial court in a criminal court to separate the witnesses upon timely application.

Ray's motion for separation of the witnesses was overruled, he excepted, he made this a ground for a new trial, it was overruled, he has embodied it in the bill of exceptions, and he has urged that here as a ground for reversal.

By its terms, section 601 of the Code in civil cases, leaves this in the discretion of the trial court, and we have refused to reverse judgments where the rule had not been applied when requested and when in our opinion this discretion had not been abused, but we made it one of the grounds upon which the judgment was reversed in Salisbury v. Com., 79 Ky. 425, in Walker v. Com., 8 Bush (71 Ky.) 86, and in Johnson v. Clem, 82 Ky. 84, and we approved the action of the trial court in excluding the witnesses in Com. v. Phillips, 14 S. W. 378, 12 Ky. Law Rep. 410. The case of Roberts v. State, 100 Neb. 199, 158 N. W. 930, 932, Ann. Cas. 1917E, 1040, is a case in many respects like this, and in the opinion reversing the judgment it is said: "The defendant demanded that the state's witnesses be separated so as not to hear each other's testimony. In some jurisdictions this is a matter of right. Greenleaf, Evidence (16th Ed.), sec. 432, says: 'This order, upon the motion or suggestions of either party, is rarely withheld.' Binfield v. State, 15 Neb. 484, 19 N. W. 607. In our state it has been considered to rest in the discretion of the trial court. This court has said that the practice of so separating the witnesses 'is a good one, as it tends to elicit the truth and promote the ends of justice.' Chicago, Etc., R. Co., v. Kellogg, 54 Neb. 138, 141, 74 N. W. 403. So far as we now recollect, the court has never suggested what would amount to an abuse of discretion in that regard. To have separated these witnesses would seem to have been peculiarly appropriate in this case."

That is the general rule. See 38 Cyc. 1369. That rule is rather old. Often have we heard the expression, "A Daniel come to Judgment," without stopping to consider the source of the expression. It is found in the History of Susanna and the Elders, contained in Daniel, Ch. 13, of the Douai translation of the Bible made in 1582 and in the History of Susanna as given in the translation authorized by King James the First in 1611. Abbreviating the story it is: That Susanna, a most beautiful and God-fearing woman was the wife of Joakim, a very wealthy man at whose home the court met. Two of the elders who were members of the court had observed that it was her custom at midday to walk in her husband's orchard and to bathe herself when it was hot. These two had learned to love her, and they watched carefully each day to see her. When the court adjourned one day at noon each left by a different way, yet each came back again, and, meeting, each acknowledged to the other his lust for the chaste Susanna. Watching for opportunity, they hid themselves in the orchard, and on one day Susanna had her maids bring her materials for bathing and had sent them away with directions to close the doors of the orchard, whereupon the elders came forward and made improper proposals to Susanna, which she rejected, and they threatened to her that they would testify against her that they had seen a young man with her, but Susanna only cried out, and these elders opening the doors of the orchard cried out against her, and Susanna was seized, brought to trial, on the charge of adultery they testified as they had threatened, and that the young man had escaped, the multitude believed them and condemned Susanna to death; whereupon Daniel came into court, and, having manifestly his authority as a member of the court, he said: "Return to judgment, for they have borne false witness against her." The court reassembled. And Daniel said to the people: "Separate these two far from one another, and I will examine them." So when they were put asunder one from the other, he called one of them and said to him: "Now then, if thou sawest her, tell me under what tree thou sawest them conversing together." He said: "Under a mastic tree." And, having put him aside, he commanded that the other should come, and he said to him: "Now therefore tell me, under what tree didst thou take them conversing together." And he answered: "Under a holm tree." With that all the assembly cried out with a loud

voice, and they rose up against the two elders, and Daniel became great in the sight of the people from that day, and thenceforward.

We are not saying the witnesses against Charley Ray have testified falsely, but we do say that under the peculiar facts of this case it was an abuse of discretion to overrule the defendant's motion, and for that error this judgment is reversed.

The whole court sitting; CHIEF JUSTICE DIETZMAN and JUDGE THOMAS dissenting.