997 So.2d 1148 (2008)
FORD MOTOR COMPANY, Petitioner,
v.
Joan HALL-EDWARDS, as Personal Representative of the Estate of Lance Crossman Hall, Respondent.
No. 3D08-2447.
District Court of Appeal of Florida, Third District.
December 3, 2008.
Rehearing Denied January 8, 2009.
*1149 Cole, Scott & Kissane, and Henry Salas, Miami; Carlton Fields, Wendy F. Lumish and Cristina Alonso, Miami, for petitioner.
Kathleen Clark; Bruce Kaster, Ocala; Denney & Barrett, and Richard Denney and Lydia JoAnn Barrett; Gustavo Gutierrez, Coconut Grove; Alters, Boldt, Brown, Rash & Culmo, Kimberly L. Boldt; and Richard M. Mogerman, Dania, for respondent.
Before RAMIREZ, ROTHENBERG and SALTER, JJ.
RAMIREZ, J.
This is a Petition for Writ of Certiorari filed by Ford Motor Company asking this Court to quash orders of the trial court entered on September 23, 2008 (the "Suspension Order") and September 25, 2008 (the "Sanction Order"). Because the trial court's orders would result in a violation of the work product and the attorney-client privilege, they depart from the essential requirements of the law and would result in irreparable harm, appropriately reviewable by certiorari jurisdiction. Once disclosed, the privileges are lost and no subsequent relief can be provided by appeal. See Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla. 1987).

I.
On April 19, 1997, Lance Crossman Hall was a passenger in a Ford Explorer when the driver fell asleep and lost control of the vehicle, which resulted in Lance being ejected and killed. Plaintiff, Joan Hall-Edwards, as personal representative of Hall's estate, brought an action against Ford alleging defects in the Explorer's handling and stability characteristics.
At a prior trial, the jury determined that Ford was liable for placing the Ford Explorer on the market with a defect relating to the design of the vehicle's stability and handling and that this was a legal cause of the accident. The jury awarded $30 million *1150 to Hall's mother, Joan Hall-Edwards, and $30 million to his father, Lester Hall. See Ford Motor Co. v. Hall-Edwards, 971 So.2d 854, 855 (Fla. 3d DCA 2007). We reversed that award because the trial court committed reversible error in permitting testimony referencing other rollover accidents involving the Ford Explorer without requiring a showing of substantial similarity between those rollovers and Hall's accident. Id. at 856. We also reversed because, during closing argument, plaintiff's counsel claimed that Ford had "killed hundreds of people." Id. at 858. We remanded for a new trial on liability and damages. Id. at 860.
On remand, the trial court held a hearing on June 10, 2008, where plaintiff's counsel requested a pretrial conference to deal with OSI's (other similar incidents). Plaintiff's expert, Dr. David Renfroe, previously had testified about the rollover propensity of Ford Explorers where there were deaths and serious injuries and that Ford had received from Dr. Renfroe reports about those cases. In fact, he previously testified that he had told Ford about 150 times about the problem. Id. at 857. At the June 10, 2008, plaintiff's counsel represented to the court that the experts were prepared to testify as to those similarities. The only discovery contemplated at that hearing was a new expert to replace the one that had died and depositions on OSI, with an OSI hearing during the summer and a trial on September 22, 2008.
The court held a status conference on August 20, 2008, which resulted in an order dated August 22, requiring Ford "to produce within twenty-four (24) hours of this hearing the [federal] Rule 26 (or state equivalent) reports prepared by Messrs. Tandy, Pascarella and Carr in each of the cases that Dr. Renfroe identified as [OSIs] in this matter." The order further provided that if Ford failed to produce these reports, "the Court will consider ordering a search of the General Counsel's Interactive Case Management Data Bases System, LMMS [Litigation Matters Management System], and all other data bases which contain OSI or other similar incident material, for those claims identified as [OSIs] by the Plaintiff." This discovery was ordered without any prior motion or discovery request.
On August 26, plaintiff filed a motion to enforce the August 22 order, claiming she was entitled to the reports and asserting again that these reports could be found in the LMMS database. Plaintiff's attached orders to its motion from other courts purporting to support its position that the court should order a search of the LMMS database. On August 29, at a hearing on other matters, the trial court, sua sponte and without notice to Ford, ordered the depositions of Attorney Kara Tertzag Lividini and another Ford attorney, Jodi Schebel, in connection with their affidavits concerning the LMMS database and expert reports. The court, relying on the orders attached to Plaintiff's motion to enforce stated "there are doubts in my mind about the veracity of the witnesses and that's why I want them deposed."
On September 5, the trial court entered an order requiring Ford to file an affidavit of due diligence and compelling Ford to provide details about its search for the expert reports. Paragraphs 2a through h of this order required Ford to provide details about its search for the expert reports, such as when the query was made; to whom each query was made; what search parameters were requested; etc. The order did not specify a time for compliance.
Ms. Schebel was deposed on September 8, 2008. At a hearing on September 15, on several unrelated motions, Ford reported that it had completed its search for the *1151 expert reports and had produced sixteen responsive reports that it had found in its own files, in the files of its outside counsel, and in the files of the three experts involved. The trial court, however, did not believe there could only be sixteen reports. It ordered that Ms. Lividini's deposition should proceed as scheduled on September 16.
During her deposition, which was supposed to be about the LMMS database and the search for expert reports, plaintiff's counsel asked Ms. Lividini whether there were "suspension orders" in effect for Explorer documents. Ford's "suspension orders" are communications issued by attorneys in Ford's Office of General Counsel in connection with certain anticipated or pending litigation and administrative proceedings. They provide legal advice concerning documents that should be preserved in connection with those matters. Later that same day, the court ordered Ford to produce those suspension orders for an in camera inspection.
In an attempt to comply with the September 5 order requiring due diligence affidavits, Ford filed five affidavits describing the efforts it had undertaken to identify, locate, and produce the expert reports it was ordered to produce. The affidavits were signed by two attorneys and three experts. The affidavits of the three experts established that on August 20, Kathleen Clark, trial counsel for Ford in this case, contacted them and asked them to search for and provide responsive reports; that they directed their staff to search for and provide responsive reports; and that they provided responsive reports to Ms. Clark. The affidavit of Richard Paul, national discovery counsel for Ford, established that on August 26 and August 28, legal assistants and a lawyer in his firm searched Ford's own files for responsive reports under his supervision and direction. The affidavit of Ms. Schebel, also national discovery counsel for Ford, established that on September 3, 4, and 5, she communicated with outside counsel identified by Ford as responsible for the seventy eight cases at issue to obtain any responsive reports in their possession.
At a hearing the next day, the court stated that Ford had violated the September 5 order by not providing specific enough information as to the following:
when each query was made, to whom each query was made, by name, actually who did it, who asked, who answered, what search parameters were requested, what searching employee  well, except to the extent that it didn't include any other databases, it didn't even identify databases, especially not to the extent that the order requires a search for not only LMMS, but also equivalent electronic databases. It doesn't say what each searching employee responded to recording each of their inquiries.
The court made no finding that Ford had failed to find or produce any expert reports in its possession. The trial court refused to examine the boxes that Ford brought into the courtroom, which contained its production to plaintiff with regard to the seventy eight cases at issue. Further, Ford requested an opportunity to call plaintiff's expert, Dr. Renfroe, to the stand to testify regarding information which might be missing. Although Dr. Renfroe was present in the courtroom, the trial court denied this request. The trial court went on to state that, at this time, it was not finding that plaintiff was prejudiced in her ability to prove her case.
This resulted in the "Sanction Order" under appeal which grants access to all of Ford's databases. Ford argues that this order invades its attorney-client and opinion work product privileges by requiring disclosure of its LMMS database. Ford *1152 further argues that the database records only attorney-selected facts, notes, opinions, mental impressions, thoughts, strategy, and legal advice about litigation. Finally, Ford contends that the order is also grossly overbroad and exceeds the permissible limits on discovery by allowing plaintiff's expert to search through all Ford Motor Company databases, regardless of subject matter or content for a loosely defined category of information.
The court entered its written order to that effect on September 25, 2008. Although the written order purports to provide for in camera review of information for which Ford claims a privilege, it does so only after plaintiff's expert has viewed the privileged information. The order requires plaintiff's expert to agree to a "confidentiality order" before viewing Ford information. But this permits plaintiff's expert to disclose any Ford documents or information, including documents and information which Ford claims are privileged and which have been submitted for in camera review, to plaintiff, plaintiff's counsel, plaintiff's counsel's clerical staff, plaintiff's testifying experts, plaintiff's consulting experts, other witnesses in this case, and attorneys, experts, and consultants representing other plaintiffs in other similar cases.
The other order under the review, the "Suspension Order," requires Ford to produce claimed attorney-client and work-product privileged suspension orders, i.e., documents in which Ford attorneys provide legal advice to Ford employees about document retention matters. The order entered an in camera inspection purports to redact the privileged information and orders production of the redacted documents.

II.
This case appears to have gone astray after we reversed and remanded. Our opinion and the quoted passages from the testimony seem to reveal that at one point the plaintiff had been prepared to argue, and indeed argued, that Ford Explorers were defective regarding handling and stability characteristics. During the 2005 trial, the plaintiff bolstered these characteristics through the testimony of experts who had warned Ford about the problem about "150 times." Our reversal was not based on any new evidentiary requirement that the plaintiff lay a sufficient predicate to establish substantial similarity between this accident and the other accidents which had "killed hundreds of people." The predicate for admissibility of similar accident evidence is not a new evidentiary requirement. See, e.g., Railway Exp. Agency, Inc. v. Fulmer, 227 So.2d 870, 873 (Fla.1969) ("Evidence of the occurrence or non-occurrence of prior accidents is admissible only if it pertains to the use of the same type of appliance or equipment under substantially similar conditions.") (citing 13 Am. Jur. Evidence s 141 (1957)). We thus fail to see how these discovery disputes have now surfaced more than eleven years after the accident and three years after the first trial.
The trial court's sanction order seems predicated on an unproven assumptionthat Ford's attorneys can access its LMMS database, make a few key strokes on a computer, and expert reports would spit out unto a laser printer, readily available for disclosure to the plaintiff in this case.
Work product privilege protects "materials prepared in anticipation of litigation by or for a party or its representative." Southern Bell Tel. & Tel. Co. v. Deason, 632 So.2d 1377, 1384 (Fla.1994). "[A]n attorney's mental impressions, conclusions, opinions, or theories concerning the client's case are opinion work-product *1153 and are absolutely privileged." 5500 N. Corp. v. Willis, 729 So.2d 508, 512 (Fla. 5th DCA 1999). The privilege extends to an attorney's selection of the facts and information that the attorney considers important to the case. See Smith v. Fla. Power & Light Co., 632 So.2d 696, 699 (Fla. 3d DCA 1994) ("Considerations of need and undue hardship are not relevant in this analysis because the protected collection of documents constitutes opinion work product, which is absolutely or nearly absolutely privileged.").
Ford asserts that this privilege extends to the entire LMMS database because it consists entirely of information selected by Ford's attorneys that they consider important to a lawsuit or claim, and their mental impressions, thoughts, opinions, theories, strategies and legal advice based on that information. The affidavit and deposition of Ms. Lividini established, inter alia, that the LMMS database was created and is maintained exclusively by Ford's in-house attorneys, and other legal personnel working under their direction, to record attorney-selected information about pending litigation and claims asserted against Ford. Plaintiff did not controvert these assertions. The LMMS database basically functioned as an attorney notebook to record the thoughts, impressions, opinions, and strategy of Ford's attorneys about litigation and is immune from discovery.
Ford has also asserted the attorney-client privilege, which protects confidential communications between a lawyer and client, as well as third persons to whom disclosure is in furtherance of the rendition of legal services and those reasonably necessary for the transmission of the communication. See § 90.502, Fla. Stat. (2000); Southern Bell Tel., 632 So.2d 1377. The privilege extends to communications between employees and in-house general counsel, whether oral, contained in documents or contained in a database. See Florida Marlins Baseball Club, LLC v. Certain Underwriters at Lloyd's London, 900 So.2d 720, 721 (Fla. 3d DCA 2005) (attorney-client privilege protects communications, including documents from in-house counsel to corporate employees).
We believe that the evidence before the trial court established that the LMMS database was used as a mechanism for Ford's inside and outside counsel to communicate among each other, exchanging thoughts, opinions, strategies, mental impressions and advice regarding the defense of lawsuits and claims. These communications are made solely for the purpose of, and in furtherance of, the rendition of legal services to Ford and fall within the scope of the job duties of Ford's in-house counsel. Thus, the evidence established that LMMS qualifies as confidential communications that are immune from discovery under the attorney-client privilege.
Once Ford established that the databases were privileged, plaintiff had the burden to prove facts which would make an exception to the privilege applicable. See Quarles & Brady, LLP v. Birdsall, 802 So.2d 1205, 1206 (Fla. 2d DCA 2002). Plaintiff Hall-Edwards presented no evidence to challenge any of the facts established by the sworn affidavits and testimony of Ford's counsel. Thus, the evidence was undisputed that the LMSS database is privileged. The trial court never found to the contrary. Accordingly, the LMSS database is protected from disclosure by the attorney-client privilege.
While the trial court's order purports to provide for in camera review of information for which Ford claims a privilege, the provision for in camera review is meaningless. The order provides for in camera review only after plaintiff's expert has viewed the privileged information. Once third parties view the information, *1154 the privileged nature of the information is destroyed. See Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla.1987).
Furthermore, while plaintiff's expert must sign a "confidentiality order" before viewing the information, that order permits plaintiff's expert to disclose any Ford documents or information-including documents and information which Ford claims are privileged-to plaintiff, to plaintiff's counsel, to their clerical staff, and their testifying and consulting experts, and to other witnesses in this case, as well as to attorneys, experts, and consultants representing other plaintiffs in other similar cases.
The trial court's sole reason for ordering a search of "all databases" at Ford, including the privileged LMMS database, was that Ford willfully violated the trial court's order of September 5, 2008, by filing affidavits of due diligence that lacked certain information about Ford's search for expert reports. Even if the trial court correctly found that Ford's five due diligence affidavits failed to satisfy the requirements of the September 5 order, such a correctable, and non-prejudicial, violation could not justify the invasion of attorney-client privilege and attorney opinion work product. See Marcus & Marcus, P.A. v. Sinclair, 731 So.2d 845 (Fla. 3d DCA 1999) (stating any alleged misconduct does not justify disclosure of privileged information because the sanction is not commensurate with the misconduct; quashing order compelling production of privileged documents).

III.
We conclude that the Ford suspension orders were created by Ford's attorneys in anticipation of litigation and thus constitute work product. Moreover, because revealing the documents identified by Ford's counsel as those that need to be kept in anticipation of litigation would reveal the mental impressions of counsel, suspension orders fall within the absolute immunity protecting opinion work product. See Smith, 632 So.2d at 699; 5500 N. Corp., 729 So.2d at 512.
Further, the suspension orders constituted legal advice given by Ford's Office of the General Counsel to its client concerning the scope of documents which should be retained for purposes of pending or anticipated litigation. Thus, they are protected under the attorney-client privilege. See Kirk v. Ford Motor Co., 141 Idaho 697, 116 P.3d 27, 33-34 (2005); Florida Marlins Baseball Club, LLC, 900 So.2d 720, 721 (Fla. 3d DCA 2005). Consequently, we also reverse the "Suspension Order" dated September 23, 2008.

IV.
For all of the foregoing reasons, this Court quashes the trial court's orders of September 23 and 25, 2008.
Quashed.