Brian Allen McGUIRE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000040–MR.

Supreme Court of Kentucky.

June 21, 2012.

Julia Karol Pearson, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Courtney J. Hightower, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant Brian Allen McGuire appeals from a judgment of the Fayette Circuit Court convicting him of first-degree manslaughter (KRS 507.030) and unlawful possession of a weapon on school property (KRS 527.070), and sentencing him to a total of twenty-years imprisonment. He was tried on the charge of murder, but was convicted on the lesser included charge of first-degree manslaughter based upon his successful defense that he committed the killing while acting under extreme emotional distress (EED).

Appellant raises the following claims of error: (1) that he was denied his constitutional right to present a defense because Fayette County Public School authorities and the school system's general counsel interfered with his efforts to interview witnesses employed by the school system; (2) that the trial court erred by permitting the Commonwealth to present evidence concerning Appellant's stressful personal life during its case-in-chief; (3) that the trial court erred by permitting a friend of the victim to present victim impact evidence during the penalty phase of the trial, in violation of KRS 421.500; (4) that the trial court erred in the penalty phase of the trial by disallowing mitigation testimony from Appellant's father; and (5) that the trial court violated RCr 9.74 by permitting the jury to rehear a witness's testimony outside of Appellant's presence. For the reasons explained below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Daniel Donato were co-workers on the custodial staff at Leestown Middle School in Fayette County when Appellant shot and killed Donato in the doorway of the faculty lounge. Donato suffered at least twelve gunshot wounds, including superficial grazes and possible shrapnel injuries.

Appellant did not deny shooting Donato. At trial, Appellant defended against the murder charge by claiming that at the critical moment, he was acting under the influence of an extreme emotional disturbance (EED). The underpinning of that defense, which proved to be successful, was his claim that he had been repeatedly harassed, threatened, and bullied by Donato. Testimony of several employees at the school who had observed the interaction between Donato and Appellant tended to support Appellant's claim. The day before the shooting, Appellant had requested assistance from the school system's human resource office. That office undertook an aggressive effort to address his concerns, including plans to draft a letter suspending Donato and, ironically, to have school system's security personnel present at the Leestown School the next day to escort him off the property.

As further discussed in Section III, the Commonwealth's theory of the case was that, rather than a response to bullying, the actual motive for the shooting was that Appellant was jealous and envious of Donato. Appellant struggled in his personal life with financial and other hardships, while Donato seemed to have an easier life, with a higher standard of living as a result of financial assistance from his in-laws.

The day that Donato was to be suspended, Appellant stood in the hallway talking to another custodian. When Donato approached, Appellant drew a gun, pointed it at Donato, and began shooting. Appellant immediately fled the scene, and drove westward. The next day, he surrendered to authorities in Missouri.

Soon afterward, Appellant was indicted for murder and unlawful possession of a weapon on school property. At the conclu-

sion of the trial, the jury accepted his defense theory by acquitting him of murder, and convicting him instead of first-degree manslaughter, for which it recommended a twenty-year sentence. Appellant was also found guilty on the weapons charge. The jury recommended a five-year sentence, to be served concurrently with the manslaughter sentence. Judgment was entered in accordance with the jury's verdict and sentencing recommendation. This appeal followed.

## II. DENIAL OF DEFENDANT'S RIGHT TO PRESENT A DEFENSE

■ Appellant first argues that he was denied his right to present a defense by actions of the school board and its general counsel, Brenda Allen, that interfered with his attorney's efforts to interview witnesses employed by the school system. Following Appellant's arrest, his attorney, Andrew Bowker, and investigator, John Baldridge, went to see Brenda Allen to request her cooperation with their need to meet and interview witnesses who were school employees. It appears that Allen denied their request to meet immediately with school employees, but she did offer to contact each of the employee-witnesses to ascertain whether they would "grant" the defense team an interview and to provide the employees with defense counsel's telephone numbers.[1] Despite these arrangements, and in what would obviously be a material violation of the agreement, the next day Baldridge went to Leestown Middle School during work hours, located one of the employee-witnesses, and interviewed him at his workplace.

In response to Baldridge's visit to the school, acting superintendent Mary H. Wright sent a stern letter to Bowker and Baldridge informing them they were banned from all school system property. The letter stated, among other things:

We are disappointed with the manner in which you have chosen to handle this situation and the breach of trust and utter lack of professional courtesy you displayed. As Ms. Allen discussed with Mr. Bowker by phone yesterday, the two of you and your investigator and anyone working on your behalf or on behalf of your client Brian McGuire are banned from all Fayette County Public School property from this point forward. You are prohibited from entering or remaining on any of our properties without express permission from Ms. Allen. Failure to abide by this prohibition may result in legal action being taken against you.

School attorney Allen sent an equally firm letter to Bowker and Baldridge stating, in part, as follows:

Despite our agreement, Mr. Baldridge appeared at Leestown Middle School the following morning and attempted to interview those staff members. Mr. Baldridge did speak with [a school employee], contrary to our agreement, regarding the shooting. As I indicated to you when I contacted you upon learning of this stunt, I do not appreciate the manner in which you have chosen to handle this matter. Your conduct is completely and totally unprofessional and now alters our approach to dealing with you. To that end, and so there is no mistake, I am counsel for the Board of Education of Fayette County, a corporate client comprised of the sum of its employees and agents. Contact with any of my clients (with the exception of

---

1. The parties appear to agree with this description of the initial arrangement between Allen and trial counsel.

Mr. McGuire's family who are present/former employees of the district) regarding Brian McGuire, Jose Daniel Donato or any matter within the scope of either of their employment with the Board of Education of Fayette County is prohibited.

Moreover, [none of the school employee witnesses] wish to speak with you and have declined your request for an interview. They have asked that I relay to you that all future contact must go through me.... Should you wish to speak to any of my clients, you may contact me, but you should realize now that the aforementioned staff members are willing to speak with you only under a court order or subpoena.

Further, as detailed by the letter to you from Mary Wright, Acting Superintendent, you are prohibited from entering any of our property, as is the case for anyone working on your or Mr. McGuire's behalf.[2]

Defense counsel's subsequent difficulty in getting interviews with school witnesses—even during their personal time away from work—eventually led to the filing of a "Motion to Prevent Witness Tampering." The motion sought a hearing on whether the school system "or any other government agent with or without support of the Commonwealth has tampered with witnesses in this criminal case." Appellant requested that the court "issue appropriate orders to stop any witness tampering that is occurring." The motion was accompanied by an affidavit from Bowker explaining his difficulties in accessing witnesses. He specifically referenced his attempt to speak with one employee who

told him he would not speak to anyone on the defense team "due to not being comfortable speaking to us about the case and that he would feel more comfortable if we spoke with [school system attorney] Brenda Allen."

At the hearing on the motion, defense counsel expressed concern that the school system had pressured employees not to speak to the defense team.[3] The prosecution responded that a system had been set up to contact witnesses, and that the witnesses had been told that they could speak to the defense or the Commonwealth if they wanted to, but were not required to do so.

The school's human resources director Melodee Parker testified that Allen had informed the school employee witnesses that anyone who attempts to speak with them about the shooting incident should be referred to Allen. She did not, however, indicate that Allen's directive distinguished between interviews attempted during the employees' work time, as opposed to those made during their personal time. At the hearing, the trial court accepted assurances from Parker that she and the school system would assist the defense in meeting with the witnesses. Defense counsel said he would be satisfied with that, and requested no further relief at that time.

However, at a pretrial hearing a few weeks later, defense counsel again complained that the school system was not assisting his effort to meet with witnesses. The Commonwealth claimed there had been no problem setting up meetings under the established proceedings. The trial

---

2. Allen also disclosed in this letter that she had a personal relationship with Bowker and that she was "disappointed" in his conduct.

3. At an earlier hearing, defense counsel told the court that he had contacted a school employee/witness who told him that "he [the witness] had been instructed not to speak with the defense because it may affect his employment status."

court expressed displeasure at the conflict and warned that the school's failure to assist was "a big problem." She told defense counsel that if the problem persisted, she "would deal with it." Again, Appellant requested no additional relief.[4]

Significantly, Appellant's argument for reversal makes no allegation of error by the trial court. Indeed, it appears that the trial court granted all relief requested. Neither does Appellant allege prosecutorial misconduct by the Commonwealth in frustrating his efforts to interview school witnesses. Rather, all allegations of wrongdoing are directed at the school personnel and attorney Allen. Appellant's argument raises several interesting issues.[5] However, as interesting as they may be, we need not examine them because even if we assume for purposes of our review the school system's impediment of witness interviews was of constitutional magnitude, any such interference was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (A trial error involving the denial of a federal constitutional right is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."). This is so because it is inconceivable that Appellant could have had a more favorable result in the guilt phase of the trial. Though tried for non-capital murder and thereby facing a possible life sentence, Appellant's jury, based largely upon the testimony of the school employee witnesses, accepted the EED defense and acquitted him of murder, while finding him guilty of the lesser offense of first-degree manslaughter. Under the facts of this case, Appellant had no prospect of a better verdict. No other lesser-included offense instructions (such as for second-degree manslaughter or reckless homicide) were available, and there is no possibility that the venire was going to engage injury nullification under the facts of this case so as to return a verdict of absolute acquittal. *See Commonwealth v. Durham,* 57 S.W.3d 829, 838 (Ky.2001) ("Jury nullification—the right of a jury to acquit for whatever reasons even though the evidence supports a conviction—is an important part of the jury trial system guaranteed by the Constitution.").[6] Accordingly, Appellant's guilt phase defense was an unqualified success.

Thus, any possible prejudice could only have occurred at the penalty phase of the trial. First-degree manslaughter is a Class B felony, which carries a sentence

---

4. In a somewhat related matter, the record also indicates that Parker had communications with the prosecutors regarding subsequent defense efforts to contact witnesses. Upon learning about this, the trial court ordered Parker not to be contacting the Commonwealth "in any way" about defense efforts she was aware of. Appellant requested no further relief beyond this, and Appellant does notrely upon this occurrence as grounds for relief.

5. For example, (1) may a reversal on direct appeal be premised upon actions by third-parties in the absence of error by the trial court or wrongdoing by the Commonwealth; (2) what remedies are available to a defendant when a third-party is interfering with his efforts to interview witnesses; (3) what is the scope of the authority of the general counsel of an organization to control witnesses in a criminal case involving the organization; (4) what are the circumstances under which the employees of an organization are considered the "clients" of general counsel, and whether this includes the situation we address; (5) does the analysis of the foregoing factors change if the organization is a governmental actor, such as here; (6) does it make any difference if civil litigation is imminent or pending; and (7) whether application of the foregoing considerations to the school board and/or Allen compels a conclusion that they violated Appellant's right to present a defense.

6. *Quoting United States v. Leach,* 632 F.2d 1337, 1341 n. 12 (5th Cir.1980).

often to twenty years. KRS 507.030; KRS 532.060(2)(b). While Appellant did get the maximum sentence for this conviction, again, we may say with confidence that there is absolutely nothing that could have been learned from the pretrial interviews with the school witnesses that could have been used during the *penalty phase* of the case to affect the jury's sentencing recommendation. It is significant that, although the jury convicted Appellant of the possession of a weapon on school property charge, it recommended that the associated five-year sentence run *concurrently*, rather than consecutively, with the manslaughter sentence. Thus, Appellant again achieved significant success in the penalty phase of the trial in that he essentially received a free pass on the weapons charge. Accordingly, assuming the troublesome conduct of school officials did indeed impair his ability to interview witnesses, the effect was harmless beyond a reasonable doubt.

Because of the importance of the issue, we use this occasion to briefly set forth the fundamental principles that would control in a situation like this, which would also include a general workplace setting,[7] to avoid a recurrence of the employer errors that seem to have occurred in this case. We refrain from a detailed application of the principles to this particular case, not only because any potential misconduct was harmless, but also because we do not have specific factual findings from the trial court with respect to the particular allegations. With this caveat, we proceed to briefly cite to the controlling authorities implicated in a case of workplace violence.

Witnesses in a criminal trial belong neither to the state nor to the defense. In criminal proceedings, the prosecution and the defense have an equal right to interview witnesses before trial. *United States v. Ash*, 413 U.S. 300, 318, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) ("[T]he interviewing of witnesses before trial is a procedure that predates the Sixth Amendment. In England in the 16th and 17th centuries counsel regularly interviewed witnesses before trial. The traditional counterbalance in the American adversary system for these interviews arises from the equal ability of defense counsel to seek and interview witnesses' himself." (*Citing* W.S. Holdsworth, History of English Law, 226–228 (1926))); *see also Commonwealth v. Peters*, 353 S.W.3d 592, 597–598 (Ky. 2011); *Radford v. Lovelace*, 212 S.W.3d 72, 82 (Ky.2006)[8] (both sides have the right to interview witnesses before trial); *Neal v. Commonwealth*, 95 S.W.3d 843, 848 (Ky. 2003) (A witness has the right to speak with any party he desires); *United States v. Long*, 449 F.2d 288, 295 (8th Cir.1971); *Callahan v. United States*, 371 F.2d 658, 660 (9th Cir.1967); *Gregory v. United States*, 369 F.2d 185, 188 (D.C.Cir.1966); 22A C.J.S. *Criminal Law* § 634 (2012). By the same line of reasoning, it follows that the school witnesses in this case did not "belong" to the school system or its general counsel.

Because of this, insofar as the employees' personal time was concerned, defense counsel had at least as much right to communicate on this matter to the witnesses employed by the school system as did the school system or its general counsel, and it was not the function of either,

---

**7.** It is worth noting that the employer in this case was a government actor, which implicates additional constraints upon its ability to interfere with the constitutional rights of a defendant, as opposed to when the involved employer is a private actor. *See, e.g.,* Civil Action for Deprivation of Rights, 42 USC § 1983 (2012).

**8.** Overruled on other grounds by *Cardine v. Commonwealth*, 283 S.W.3d 641 (Ky.2009).

therefore, to interfere with their staff members' decisions upon whether to speak with defense counsel. Further, while the school system could certainly control the access to its employees during their work-time and the logistics of a work-site interview, it had no additional right to control either the witnesses or trial counsel's access to them during non-working hours. Nor did the school system have the authority to direct employees not to talk to defense counsel, to tell the witnesses to refer defense counsel to the school's legal staff, and of course, it had no right to threaten an employee with discharge if he talked to defense counsel. *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir.1985) ("the prosecution may not interfere with the free choice of a witness to speak with the defense. . . ."); *Gregory*, 369 F.2d at 189 (defendant was denied a fair trial where the prosecution told witnesses not to talk to anyone unless the prosecutor was present); *United States v. White*, 454 F.2d 435, 438–39 (7th Cir.1971) (the prosecution cannot tell a witness not to talk to the defense, and if it does, it may be grounds for dismissal of the charges or reversal of the conviction).[9]

■ Further, the employees of the school system were not, based merely upon their employment status, the *clients* of the school's general counsel as indicated by Allen in her July 1, 2010, letter. *Innes v. Howell Corp.*, 76 F.3d 702, 712 (6th Cir.1996) ("The law is generally settled that an attorney for a corporation does not automatically represent the corporation's [employees] in their individual capacities, even on the same matters. There must be clear consent.").[10] Absent more, this would be true even if, such as here, a crime has been committed on the corporate premises and representatives of the defendant and the Commonwealth seek to interview corporate employees concerning the events; it should be self-evident that that fact alone does not convert the relevant employees into clients of general counsel. The absurdity of this position is demonstrated by observing that by application of such a rule, following the shooting, Allen would have been *Appellant's* counsel insofar as, during his escape to Missouri following the homicide, he was still an employee of the school system.[11]

■ The converse of the rights of the defense and the prosecution to interview witnesses unimpeded by third parties, is the opposing right of witnesses to refuse to be interviewed by either the defense or the prosecution. *Commonwealth v. Peters*, 353 S.W.3d 592, 598 (Ky.2011) (RCr 7.24 and RCr 8.03 do not authorize the trial court to compel a witness's attendance for

9. While these cases refer to constraints upon a prosecutor's right to control witnesses, it is self-evident that an employer would have no greater right to control a witness's right to speak to defense counsel than would the prosecutorial arm of the government.

10. *See also Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky.App.1978) ("The relationship of attorney-client is a contractual one, either expressed or implied by the conduct of the parties."). "Thus, the existence of the relationship hinges upon the fact of mutual assent, either explicit or tacit[.]" *Innes*, 76 F.3d at 712.

11. In other contexts, however, for example in the case of a civil lawsuit and the right to discovery, the analysis may be quite different, and there may be a general attorney-client relationship between general counsel and the organization's employees. *See, e.g., Ford Motor Co. v. Hall–Edwards*, 997 So.2d 1148, 1153 (Fla.App.2008) (The "attorney-client privilege" extends to communications between employees and inhouse general counsel, whether oral, contained in documents, or contained in a database). Accordingly our discussion would have no application to a civil lawsuit between, for example, Donato's estate and the school system.

discovery); *Radford,* 212 S.W.3d at 82;[12] *see also United States v. Scott,* 518 F.2d 261, 268 (6th Cir.1975) (recognizing that any witness has the right to refuse to be interviewed if he so desires and is not under or subject to legal process).

◼ Because a witness has this right, it obviously is not improper for someone to inform the witness of his right not to speak to either side. *See Radford,* 212 S.W.3d at 81–82. This applies even if it is the *prosecutor* telling a witness that he does not have to speak to defense counsel. *Id.* at 82. As such, in the immediate wake of a traumatic crime, the defense cannot complain if employees were advised that they may decline to speak to either the prosecutors or defense counsel.

## III. PRESENTATION OF EVIDENCE CONCERNING DEFENDANT'S PERSONAL LIFE DURING THE COMMONWEALTH'S CASE–IN–CHIEF

◼ Appellant next contends that the trial court erred by permitting the Commonwealth to introduce evidence concerning Appellant's stressful personal and family life during its case-in-chief. He contends that while the evidence may have been admissible as rebuttal evidence to refute his assertion of an EED defense, it was not relevant for introduction in the Commonwealth's case-in-chief. Appellant made timely objections, and thus preserved the issue for appellate review.

The challenged evidence was introduced through Britain Ingram, a teacher at the school. Ingram testified that he occasionally conversed with Appellant about a wide range of topics, including Appellant's personal and family problems. Ingram testified that he formed the impression that Appellant was "overwhelmed" with the pressures of child-rearing, working two jobs, going to school full-time, and meeting other personal commitments.

The Commonwealth argues that this evidence supported its theory that "this defendant was somewhat jealous or envious" of Donate, and that jealousy and envy were the motivating factors in the shooting. The trial court allowed the Commonwealth to elicit testimony from Ingram relevant to the time frame of the shooting. Appellant replies that this evidence was relevant only to rebut the bullying theory that supported his EED defense, and was therefore only admissible upon rebuttal.

To be admitted at trial, the evidence must be relevant. KRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403; *Moorman v. Commonwealth,* 325 S.W.3d 325, 332–33 (Ky.2010).

◼ "Motive" is the inducement, reason, cause, or incentive for the doing of an act. *Bates v. Commonwealth,* 189 Ky. 727, 225 S.W. 1085, 1092 (1920). Although motive is not an element of a criminal prosecution, nevertheless, evidence of motive is

---

**12.** Citing *United States v. Black,* 767 F.2d 1334, 1337 (9th Cir.1985); *United States v. Rich,* 580 F.2d 929 (9th Cir.1978); *State v. Singleton,* 853 S.W.2d 490, 492 (Tenn.1993); *Dover v. State,* 250 Ga. 209, 296 S.E.2d 710, 712–13 (1982); *Hill v. State,* 366 So.2d 296, 312 (Ala.Crim.App.1978); and *Commonwealth v. Balliro,* 349 Mass. 505, 209 N.E.2d 308 (1965).

relevant and admissible to prove conduct consistent with the motive, as well as willfulness or criminal intent. *Wright v. Commonwealth*, 221 Ky. 226, 298 S.W. 673, 674 (1927). Therefore, the Commonwealth was entitled to introduce its theory of why Appellant killed Donato during its casein-chief.

Further, the evidence presented through Ingram was only the first part of the Commonwealth's evidence demonstrating the reason why Appellant would be jealous and envious of Donato; the second part of the reason was brought in later through the testimony of coworker Rick McCoy, who testified that Appellant had complained that Donato had financial advantages that were not "fair," and that the rest of the custodian crew "all worked [their] butts off and all [Donato's] check went to the bank and his mother-and father-in law paid for everything."

We agree that a reasonable inference may be drawn from this evidence that Appellant was aggravated because he struggled financially and, being overwhelmed by the stresses of his personal life, may have resented Donato for his apparently much easier lifestyle. The purpose of the testimony was not simply to rebut Appellant's EED defense, rather it had the independent purpose to, by reasonable inference, suggest the actual motive for the killing—that is, that Appellant's jealousy and envy turned to resentment and animosity that spawned the shooting.

The trial court did not err by permitting Ingram to testify during the Commonwealth's case-in-chief about Appellant's ex-pressions of stress and resentment during the time leading up to the shooting.

## IV. PENALTY PHASE VICTIM IMPACT EVIDENCE

 Before the penalty phase of the trial began, the prosecutor informed the trial court that all of Donato's family had chosen to remain in the court room during the trial, and thereby, he believed, had forfeited their right to present victim impact evidence as authorized by KRS 532.055(2)(a)(7) during the penalty phase based upon the separation-of-witnesses rule, KRE 615.[13] Instead of family members, the prosecutor offered victim impact evidence through Donato's friend, Eddie Baker. Appellant did not object to Baker's testimony. He now contends that Baker's testimony violated KRS 532.055(2)(a)(7) and KRS 421.500. He acknowledges that the issue is not preserved, but requests palpable error review pursuant to RCr 10.26.

KRS 532.055(2)(a)(7) authorizes the Commonwealth to present during the penalty phase of the trial "[t]he impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]" As applicable in this case, KRS 421.500(1)(b) permits victim impact testimony from the victim's spouse, adult child, parent, sibling, and grandparent. We find no way to construe KRS 532.055(2)(a)(7) and KRS 421.500(1)(b) that would permit victim impact evidence from a friend. Within the context of the applicable statutes, Baker

---

**13.** We have not heretofore specifically addressed whether, under KRE 615, a witness who watches the guilt phase of the trial is thereby precluded from testifying during the penalty phase. The issue does not surface at this point because the Commonwealth voluntarily declined to proffer as penalty phase victim impact witnesses, the family members who observed the guilt phase of the trial. The question is posed more directly in section V of this opinion.

was not a "victim," and it was, therefore, error for Baker to present victim impact evidence in this case.

 While permitting Baker to testify was undeniably error, we are not persuaded that the error resulted in a manifest injustice so as to require reversal for a new sentencing proceeding under the palpable error standard contained in RCr 10.26. Under the palpable error standard prescribed in *Ladriere v. Commonwealth,* "reversal is warranted 'if a manifest injustice has resulted from the error,' which requires a showing of the 'probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.'" 329 S.W.3d 278, 281 (Ky.2010) (*quoting Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006)). Manifest injustice is found if the error seriously affected the "fairness, integrity, or public reputation of the proceeding." *Martin,* 207 S.W.3d at 4.

During his penalty phase, Baker testified that Donato was a good friend and confidant, and a pleasure to be around; that he cared about people and wanted to make people happy; that his funeral was well-attended, and that Donato's mother was grieving and distraught over his death; and similar positive testimony praising Donato. Baker's testimony was not so moving or emotional that it was likely to have, inspired the jury toward a more severe sentence. While Appellant did receive the maximum sentences for his crimes, the jury recommended that he serve his five-year weapons charge sentence *concurrently* with his twenty-year manslaughter sentence.

We are satisfied that it was highly unlikely that Baker's penalty phase testimony dissuaded the jury from imposing a lesser sentence. Accordingly, we find no manifest injustice occurred as a result of

the improperly admitted victim impact evidence.

## V. DENIAL OF REQUEST FOR APPELLANT'S FATHER TO TESTIFY IN THE GUILT PHASE OF THE TRIAL

 Appellant's father remained in the courtroom as an observer during the guilt phase of the trial. During the penalty phase, Appellant attempted to call his father as a witness to provide evidence "in mitigation or in support of leniency" as allowed by KRS 532.055(2)(b). The Commonwealth objected, citing KRE 615, the rule on separation-of-witnesses that was invoked at the outset of the trial. The trial court agreed and refused to allow testimony from Appellant's father because he had been present in the courtroom during the guilt phase of the trial. Appellant admits that the issue is unpreserved, but requests palpable error review pursuant to RCr 10.26.

KRE 615 provides as follows:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This rule does not authorize exclusion of:

(1) A party who is a natural person;

(2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or

(3) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

 If the rule is invoked, exclusion of witnesses from the courtroom is mandatory at trial in the absence of one of the enumerated exceptions in exclusion of witnesses rule. *Mills v. Commonwealth,* 95 S.W.3d 838, 841 (Ky.2003). The rationale

behind the rule is the recognition that a witness who has heard the testimony of previous witnesses may be inclined, consciously or subconsciously, to tailor his testimony so that it conforms to the testimony given by other witnesses. *Smith v. Miller,* 127 S.W.3d 644, 646 (Ky.2004). While the purpose of the rule is clearly more applicable to witnesses in the guilt phase of the trial, the rule itself does not distinguish between guilt phase witnesses and penalty phase witnesses. Therefore, the Appellant's father was clearly subject to exclusion under KRE 615. The rule, however, does not expressly preclude the testimony of witnesses who have observed or heard other witness testimony. In some situations involving guilt phase testimony, the appropriate remedy is to bar testimony from a witness who listened to the testimony of other witnesses. *Id.* Nevertheless, a trial court has broad discretion to fashion an appropriate resolution of the issue, including holding the witness in contempt or disallowing the witness's testimony.[14] Sometimes, simply permitting cross-examination of the witness as to the potentially corruptive influence of having heard prior testimony would be an adequate solution. *Woodard v. Commonwealth,* 219 S.W.3d 723, 728 (Ky.2007).[15] Significantly, Appellant did not object to the remedy of exclusion imposed by the trial court and he did not request or suggest a less onerous resolution of the dilemma.

 Notwithstanding the foregoing discussion, we emphasize that Rule 615 has its roots in our pre-bifurcated trial system[16] and thus its application to penalty phase witnesses may be somewhat outmoded. Often, barring a witness from testifying in the *penalty* phase because he heard˙some of the guilt-phase testimony does nothing to serve the purpose behind the rule. As such, it is clear that trial courts should have the broadest possible latitude to permit family members of the victim and the defendant, who have heard the guilt phase proceedings, to testify during the penalty phase in mitigation of the penalty or as a victim opposing leniency.[17]

---

14. *See Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893) ("If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court."). Indeed, some jurisdictions have a presumption *against* barring a witness from testifying for a separation of witnesses violation. *See, e.g., Benn v. United States,* 801 A.2d 132 (D.C.2002) ("It is undoubtedly true that an instance might arise, as suggested in [*Holder* ] where the court would be justified in refusing to permit such a witness to testify, but it is the exception to the rule, and should be exercised only in an extreme case, and where it clearly appears that an injustice will result. Before excluding a witness in any case, the court should inquire into the circumstances of the violation of the order, and unless it appears that the witness acted by the advice or collusion of the litigant on whose behalf he is to testify, he should not be excluded." (quoting *Jett v. Jett,* 221 A.2d 925, 927 (D.C.1966)) (emphasis removed)).

15. Overruled on other grounds by *Commonwealth v. Prater,* 324 S.W.3d 393 (Ky.2010).

16. Prior to the adoption of the Kentucky Rules of Evidence by order of this Court in 1992, the rule on exclusion of witnesses was stated in RCr 9.48. Prior to the adoption of the modern Rules of Criminal Procedure, the rule was found in Section 151 of the Code of Practice. In *Ray v. Commonwealth,* 241 Ky. 286, 43 S.W.2d 694, 696 (1931), the rule is described as "rather old" and with distinctly biblical origins.

17. It is worth noting that other jurisdictions with a similar rule have declined to apply a rigid interpretation to sentencing phase mitigation testimony. *See, e.g., State v. Jordan,* 325 S.W.3d 1, 48 (Tenn.2010). ("In this case,

In addition to Appellant's failure to object to the exclusion of his father's testimony and his failure to request an alternative remedy, the issue further remains inadequately preserved for appellate review because Appellant failed to make an offer of proof pursuant to KRE 103(a)(2), which, in the case of a ruling excluding evidence, requires the proponent of the evidence to make known to the court "the substance of the evidence" sought to be presented, unless the substance "was apparent from the context within which questions were asked." [18]

Because Appellant failed to make a proper offer of proof pursuant to KRE 103, we have no way of accurately knowing what the evidence would have been, and consequently, no way of assessing with confidence the prejudicial impact of its exclusion. We can surmise that Appellant's father would have given favorable testimony in support of his son, but without knowing what he would have said, we cannot determine what impact it may have had on the outcome of the trial. We also cannot assess the possibility that cross-examination by the Commonwealth might have brought unfavorable information about Appellant to the attention of the jury.

In summary, the trial court's exclusion of the Appellant's father's testimony was consistent with KRE 615. While we believe the trial court might have exercised its broad discretion in a way that would permit Appellant's father to appear as a witness in the penalty phase, we are unable to conclude that it abused its discretion by failing to opt for a different means satisfying the KRE 615 concern. We are not persuaded that exclusion of Appellant's father's testimony resulted in manifest injustice under RCr 10.26.

## VI. REPLAYING OF TESTIMONY OUTSIDE APPELLANT'S PRESENCE

Finally, Appellant argues that the trial court violated RCr 9.74 when it permitted the jury to hear a replaying of a portion of Ed Addison's testimony at a time when Appellant was not present. Appellant contends that the issue is not preserved, but requests palpable error review pursuant to RCr 10.26.[19]

RCr 9.74 provides, "No information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant . . . and the entire jury,

the trial court twice applied Rule 615 in a strict manner and, in so doing, prevented Defendant from offering his parents' mitigation testimony at sentencing. We hold that, in denying Defendant's motions seeking relief from the rigid application of Rule 615 to the sentencing proceeding, the trial court applied an incorrect legal standard and thereby committed error.").

18. "In contrast to earlier versions of KRE 103, the current version does not require the presentation of avowal testimony to preserve the issue of a trial court's exclusion of testimony." *Weaver v. Commonwealth*, 298 S.W.3d 851, 857 fn. 12 (Ky.2009). However, the trial court, at its discretion, may direct the offer be by avowal. KRE 103(b) ("Record of offer and ruling. The court may add any

other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form.")

19. Citing to *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' "). The Commonwealth argues that this issue was waived and abandoned at trial and thus is not subject to palpable error review. However, based upon our disposition of the issue, we need not consider whether the Commonwealth is correct in its assertion.

and in the presence of or after reasonable notice to counsel for the parties." Pursuant to RCr 9.74, the replaying of witness testimony is to be on the record in open court in the presence of the defendant. *Mills v. Commonwealth*, 44 S.W.3d 366, 371–372 (Ky.2001);[20] *Lett v. Commonwealth*, 284 Ky. 267, 144 S.W.2d 505 (1940).

Shortly after the jury began its deliberations it sent a note to the trial court asking for "a copy of Ed Addison's testimony." After convening the parties, the court stated that while the jury was entitled to watch the testimony, the parties did "not need to be present." When trial counsel advised that he would like to consult with Appellant to ascertain if he desired to be present during the replaying of the testimony the trial court responded:

> I'm probably not going to let him be here because I'm going to say that we're all not going to be here—is what I'm leaning towards—because that way, they can continue to have, they can kind of talk among themselves, just have the clerk be here to set it up.... What I want them to be able to do is watch it, watch the portion that they want and if they want to be able to look at each other and have any comment that they can do that without us all watching and seeing what they're doing.

The court advised that it was "open to suggestion;" however, Appellant did not suggest an alternative procedure, did not request to be present, and ultimately acquiesced in the trial court's suggested procedure.

There is no question that the trial court's procedure for replaying the trial testimony was erroneous. However, Appellant failed to object to the trial court's proposed procedure and, indeed, proactively acquiesced to it. Accordingly, our review is pursuant to the palpable error standard of RCr 10.26, as stated previously in this opinion.

Upon review, we conclude that there is no probability that a different result would have been obtained if Appellant had been present when the jury reheard Addison's testimony. This error is not so fundamental that it threatened Appellant's right to due process. There was no manifest injustice. *Ladriere*, 329 S.W.3d at 281. While the replaying of the testimony outside of the presence of the Appellant was error, this procedural irregularity simply does not rise to the level of palpable error.

## VII. CONCLUSION

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

All sitting. All concur.
CUNNINGHAM, J., also concurs by separate opinion in which ABRAMSON, J., joins.

---

**20.** In support of reversal on these grounds Appellant relies on the *Mills* case, a decision which reversed a conviction after the trial court permitted, over the defendant's objection, the jury access to police interview tapes which had not been played during the trial. In reversing the defendant's convictions, we stated "the interview tapes were never heard by the jury during the trial in the presence of Mills and his counsel. The statements were never subjected to adversarial testing. Allowing the jury to hear these tapes in the manner described above was an error of serious con-stitutional magnitude." *Mills*, 44 S.W.3d at 372. *Mills*, however, is distinguishable from the present case in two important respects. First, in *Mills* the police interviews were never played at trial so as to give the defendant the opportunity to challenge the evidence, whereas in this case Appellant was present for Addison's testimony, and the testimony was subject to cross-examination by defense counsel. Second, the issue was preserved in *Mills*, whereas it was not preserved in the present case. Accordingly, *Mills* does not compel reversal in this case.

CUNNINGHAM, J., concurring:

I concur with Justice Venters' well-written opinion, except for one small but important distinction. The opinion correctly points out that KRE 615—the separation-of-witnesses rule—has its roots in the pre-bifurcated days of criminal trial practice. That was when guilt and sentencing were heard by the jury in one continuous proceeding. As Justice Venters also correctly points out, the application of KRE 615 to the sentencing stage today may well be "outmoded." To provide trial courts clear direction on this issue, I simply say that KRE 615 does not apply to the sentencing stage of criminal trials, except in extreme cases where the trial court, in its discretion, believes fairness demands it. The opinion, as written, still gives the trial judges the authority to bar family members from testifying at the sentencing stage if they remained in the courtroom and observed the guilt phase in the trial of their loved one. It would also still allow judges to bar victims or their families from testifying on victim impact or otherwise at the sentencing stage if they were in the courtroom during the guilt stage. I would eliminate this possibility with one clean sweep of the judicial pen of this Court.

ABRAMSON, J., joins this concurring opinion.